UNITED STATES of America,
Plaintiff-Appellee,

v.

Fermin P. CASTILLO,
Defendant-Appellant.

No. 85–2996.

United States Court of Appeals,
Seventh Circuit.

Argued May 9, 1986.

Decided Feb. 26, 1987.

As Amended March 10, 1987.

Kim L. Kelly, Peoria, Ind., for defendant-appellant.

Mark D. Stuann, U.S. Atty., Springfield, Ill., for plaintiff-appellee.

Before POSNER, Circuit Judge, EASTERBROOK, Circuit Judge, and CAMPBELL, Senior District Judge.*

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

WILLIAM J. CAMPBELL, Senior District Judge.

Defendant-appellant Fermin P. Castillo was convicted by a jury on 14 counts of mail fraud as well as conspiring to commit mail fraud, in violation of 18 U.S.C. §§ 1341 and 371. He was given multiple sentences amounting to a six year term of imprisonment to be followed by a five year probationary period. Defendant appeals along several grounds. We affirm.

The record is rather convoluted and we shall attempt to refrain from a recital of picayune detail. Defendant was a wheeler-dealer type of character. His main business partner, at least concerning matters relevant to this appeal, was G. Dean Cooper. James H. Miller served as an important foot soldier. The jury found that by the late 1970's defendant and Cooper had created two limited partnerships, Castillo-Cooper Venture #1 (Venture 1) and Midwest Investor Limited Partnership (Midwest). Initially, a primary purpose of these two partnerships was to secure investors and capital to acquire a controlling interest in another company, United Savings Life Insurance Company (United Savings). Real estate was also discussed. James Miller was hired as a sales agent for Venture 1 (and later for Midwest as well) to secure investors for the above purposes.

Defendant and Cooper also held close to 90% of the stock in Continental National Corporation (Continental). In either late 1978 or early 1979 Continental became embroiled in litigation of significant cost with United Savings, the very company Midwest and Venture 1 were attempting to acquire (although there is evidence the attempt was stopped a year before the litigation). The government set out to prove, and the jury apparently believed, that defendant and Cooper orchestrated a scheme to defraud investors in Venture 1 and Midwest. James Miller was a sales agent of primary import for Venture 1 and Midwest. (He would later be made senior vice-president of Continental). He, Cooper and defendant

did the selling for Venture 1 and Midwest. Miller testified, under a grant of immunity, that when first hired he was told his sales pitch to investors would be that their money would be reinvested (to gain control over United Savings or in real estate) at a great return rate (approximately 20% per annum) and that beneficial tax consequences would also result. However, Miller stated that soon after being on the job, during his second *and* third conversations with defendant, he was told the investment capital acquired from Venture 1—Midwest investors was being directed to Continental accounts in order to aid that company's cash flow, which was suffering due to the expenses incurred from the United Savings litigation. (See Castillo brief p. 10). There was (at best) conflicting evidence as to whether investors were ever told their money was being invested in Continental's ongoing legal dilemma. Most investors never thought their money was being funneled into this festering problem. Most were generally given the impression they were investing and building for a future of the kind dreams are made of. There was also conflicting evidence as to whether Venture 1—Midwest investors were ever told their money was being put into a risky venture. Defendant claims he told investors there was risk involved. Some witnesses testified otherwise, claiming solid rates of returns and tax advantages were emphasized. (See, for example, Castillo brief pp. 12 and 15).

■ Defendant's first argument is that the statements of James Miller, as admitted as hearsay through the testimony of witness Lyle Bidner, were erroneously let into evidence as admissions of a co-conspirator under Rule 801(d)(2)(E) of the Federal Rules of Evidence (FRE). Castillo claims there was insufficient evidence to establish he was involved in a conspiracy at that point in the trial. When statements of an alleged co-conspirator are asked to be admitted through the hearsay exception found at FRE 801(d)(2)(E) the trial judge must first make the determination required by *United States v. Santiago*, 582 F.2d 1128 (7th Cir.1978). The government bears the burden of proving a conspiracy existed by the preponderance of the evidence. *Santiago*, 582 F.2d at 1135; *United States v. Gironda*, 758 F.2d 1201, 1217 (7th Cir. 1985). It must then be shown defendant and the declarant were members of the conspiracy. "Once the government proves the existence of a conspiracy, the government need only offer 'slight evidence' to prove that an individual was a member of the conspiracy." *Gironda*, 758 F.2d at 1217; *United States v. West*, 670 F.2d 675, 685 (7th Cir.1982). Finally, it must be demonstrated that any admitted statements were made in the course of and furtherance of the conspiracy. *United States v. Andrus*, 775 F.2d 825, 835 (7th Cir.1985). Defendant in the instant case only challenges the ruling that there was evidence sufficient to establish a conspiracy existed.

At the *Santiago* hearing, the district judge stated:

"Well, I will try to keep this short and at the same time cover the grounds that I think need to be covered for purposes of the record. The government has the burden of establishing, by a preponderance of the evidence, that a conspiracy existed, when it existed and who was a party to the conspiracy. I will say at the outset that without the documentary evidence here, there is no question what my decision would be. It would be to rule that the government had not established its burden of proof. There is not only a smoking gun here, but, if anything, some of the testimony in Mr. Cooper would appear to operate to the advantage of the defendant as opposed to being accusatory in nature."

The documentary evidence the judge referred to is found in the appendix to this opinion. Castillo claims there is no way it could be deemed to establish that, more likely than not, a conspiracy existed. We disagree.

■ The documentary evidence reveals Castillo deeply involved in business endeavors with Cooper and Miller. All had significant financial dealings with Continental and Castillo's cash receipts from Continental, even if they represent reimbursements of loaned money to Continental as he

claims, are sizable enough to lead one to conclude Castillo was fatally involved.

In addition, just because the district court claimed that without the documentary evidence the government would not have proven a conspiracy existed by the preponderance of the evidence, this does not mean the documentary evidence was necessarily the only evidence the judge relied on, as Castillo suggests (see Castillo brief p. 25). Several witnesses testified before the *Santiago* hearing was conducted. Indeed the first witness to testify was Cooper, who was charged in the same indictment as Castillo and plead guilty to mail fraud a few months before the trial. By the time of the *Santiago* hearing there were widespread allegations of the defrauding of investors. Cooper blamed the fraud on Miller. While Cooper's testimony, at face value, tended to exculpate Castillo, it is also quite possible the judge did some reading between the lines, so to speak, and, when presented with the documentary evidence found in the appendix along with the witness' allegations of fraud, it is hardly inconceivable, as Castillo claims, that the judge could believe that more likely than not Castillo had a role in a conspiracy. "The standard of review of a determination that a statement is admissible as a co-conspirator's declaration is the clearly erroneous standard." *Andrus*, 775 F.2d at 840; *United States v. Williams*, 737 F.2d 594, 609 (7th Cir.1984). We see no clear error.[1]

Defendant argues the district court erred in failing to direct a verdict in its favor at the close of the prosecution's case because the government had failed to prove he was a member of the conspiracy. Defendant elaborates that Cooper, one of the government's key witnesses, denied he ever agreed with defendant to commit mail fraud or defraud potential investors. Further, Miller never testified as to any agreements reached between him and defendant. Miller claimed he had limited contact with defendant. Defendant asserts the only evidence tying him to any agreement with

Cooper or Miller was the cash flow chart found in the appendix to this opinion. He claims the money he received from Continental was only a repayment of money he had loaned to that corporation. He adds most of the investors and Miller testified he was not present at most of the sales or even cognizant of Miller's sales representations.

On a related front, defendant claims the government never established that he intended to engage in a conspiracy, even if he was involved with members of a conspiracy to defraud. He argues Cooper, the government's main witness, never testified that he, Castillo, had the requisite intent. Rather Cooper testified at one point that defendant suspected Miller of dishonest sales tactics and wanted him fired. Additionally, defendant asserts several people advised him that United Savings, once acquired, would be a "gold mine" and that Continental's litigation would be successfully resolved and the corporation returned to profitability. Defendant argues he may have been involved in business affairs with these men, but had no idea he was part of a conspiracy to defraud. Finally, defendant points to the fact that once the diversion of investor funds was discovered, he was forthright with the investors and filed his own petition for bankruptcy, revealing the financial statements of the limited partnerships.

We must reject all of these arguments. Viewing the conflicting evidence and inferences to be drawn from the record in a light most favorable to the government (see *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)) we find sufficient evidence to support the jury's verdict. First and foremost, on page 10 of defendant's brief, defendant admits James Miller testified that in his second *and* third conversations with defendant, defendant informed him that investors' money was being diverted to Continental, not

---

1. Defendant claims the district court erred in considering "non-evidentiary matters" in using the document found in the appendix to reach his ruling. Yet he also admits FRE 104(a) al-

lows inadmissible evidence to be considered in ruling on this question. (Citing *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977)).

being put toward acquiring United Savings or real estate. This incriminating testimony of Miller's goes to defendant's participation or "membership" in the conspiracy as well as his intent to become part of the conspiracy by defrauding investors. Further, the cash flow chart defendant is quick to reject as lacking any probative value is hardly as benign as defendant would like one to believe. If funds were being improperly diverted to Continental, as at least Miller's testimony suggests, the flow chart reveals defendant receiving over $28,000 from this tainted corporation. Defendant claims this money was in repayment of loaned money to the corporation. Regardless, a jury was entitled to believe, for example, that defendant had an interest in diverting investor monies to Continental in order to revitalize that corporation's cash flow and secure the repayment of his loan money previously advanced. Yet, we need not speculate as to how the jury could have found defendant to have been a member of this conspiracy. The point is there is sufficient evidence for a reasonable jury to conclude defendant was intentionally involved, and that is all our concern is on appellate review.[2]

■ On a related front, defendant claims the government never established that he formulated an intent to commit mail fraud and therefore the district court erred in failing to direct a verdict in his favor as to the mail fraud counts. Yet defendant admits 18 U.S.C. § 1341 allows someone to be convicted of mail fraud if he knowingly caused another to use the mails for a fraudulent scheme (see Castillo brief p. 10) (citing *United States v. Pearlstein,* 576 F.2d 531 (3rd Cir.1978)). Castillo does not argue, as the government points out, that the mailings were not a part of the scheme (certain investors' life insurance companies would mail checks to the investors who had cashed in their policies to invest in defendant's various limited partnerships). Any member of a conspiracy is liable for the acts of another co-conspirator if done in furtherance of the agreed upon conspiracy, even if acts may have been performed before the member joined the conspiracy. *United States v. Shelton,* 669 F.2d 446, 454 (7th Cir.1982). Hence since we believe a jury was capable of finding Castillo a wilful and knowing participant in the conspiracy at issue, there was nothing inappropriate about convicting Castillo under the various federal mail fraud counts since everyone admits the mails were used to further the conspirators' goals.

■ Defendant argues the district court erred when it held inadmissible certain testimony from witness Elaine Clavey. Clavey bought interests in Venture 1 in 1976 and defendant sought to elicit her testimony that she believed his sales tactics had been forthright and honest. The district court excluded the evidence as too remote to be relevant as to defendant's state of mind in the conspiracy of the instant case, alleged to have commenced in 1979. The district court ruling here will only be reversed upon "a clear showing of abuse of discretion." *United States v. Jackson,* 780 F.2d 1305, 1314 (7th Cir.1986). *United States v. Harris,* 761 F.2d 394, 398 (7th Cir.1985). We see no abuse here. Defendant could quite conceivably have had a different state of mind or *modus operandi* when selling Venture 1 interests or units in 1976 as opposed to 1979. The district court could have quite properly concluded the Clavey testimony too remote and not probative. Indeed, similar testimony was held inadmissible in tape recorded conversation defendant sought to admit which occurred two years after the scheme at issue at trial. 780 F.2d at 1315. We note defendant was still able to use Clavey for rehabilitative purposes. She was allowed to testify positively as to defendant's reputation for honesty and integrity. We see no reversible error.

■ Defendant's final argument is that he was denied effective assistance of counsel.

"Conflict of interest claims aside, actual ineffectiveness claims alleging a deficien-

---

**2.** The jury was also instructed that any good faith, unfulfilled promises made by defendant to investors could not be used to reach a guilty verdict. With this in mind, we note the negative inferences a jury was capable of drawing from defendant's presence and participation in sales of limited partnership interests to witnesses William Janssen and Dorothy Botts.

cy in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice ... Even if a defendant shows that particular errors of counsel were unreasonable ... the defendant must show that they actually had an adverse effect on the defense ... (a) court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been reached absent the errors."

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2067–69, 80 L.Ed.2d 674 (1984).

Defendant claims that his attorney, pressed for time due to an impending three day weekend, chose not to present the testimony of certain witnesses or the defendant himself. Yet defendant does not reveal who the witnesses of such import were and what exactly they would have had to offer that would be so material. Defendant's assertions in this area are simply unsubstantiated and, having failed to show prejudice under *Strickland* criteria, there is no reason for reversal.

For the reasons set forth above, the ruling of the district court is hereby

AFFIRMED.

# APPENDIX

## MIDWEST INVESTORS LIMITED PARTNERSHIP
### DIVISION OF PROCEEDS

**DEPOSITS**

PLUM GROVE BANK ACCOUNT #100-962
- 1980: $397,500.00
- 1981: $ -0-
- 1982: $ -0-
- Total: $397,500.00

FIRST STATE BANK OF CHICAGO ACCOUNT #225-843
- 1980: $ 52,500.00
- 1981: $180,000.00
- 1982: $ 30,000.00
- Total: $262,500.00

SUBURBAN BANK OF ROLLING MEADOWS ACCOUNT #126-896
- 1980: $ -0-
- 1981: $ 22,500.00
- 1982: $ 7,500.00
- Total: $ 30,000.00

TOTAL INVESTORS CONTRIBUTIONS TO MIDWEST INVESTORS LIMITED PARTNERSHIP
- 1980: $450,000.00
- 1981: $202,500.00
- 1982: $ 37,500.00
- TOTAL $690,000.00

FROM CNC

**WITHDRAWALS**

| | FERMIN P. CASTILLO | G. DEAN COOPER | CONTINENTAL NATIONAL CORPORATION | JAMES MILLER | CASTILLO-COOPER & ASSOC. INC. | OTHER | TOTAL |
|---|---|---|---|---|---|---|---|
| PLUM GROVE BANK | $ 3,625.00 | $ 67,180.87 | $289,578.78 | $ 7,500.00 | $ 31,312.50 | [$ 1,697.15] | $397,500.00 |
| FIRST STATE BANK | $ 72,400.00 | $125,174.08 | $ 23,493.29 | $ 15,574.00 | $ 34,848.62 | [$ 8,989.99] | $262,500.00 |
| SUBURBAN BANK | $ 9,750.00 | $ 18,417.00 | $ 400.00 | $ 4,500.00 | $ 600.00 | [$ 3,667.00] | $ 30,000.00 |
| FROM CNC | $ 85,775.00 | $210,771.95 | $313,472.07 [$118,768.20] | $ 27,574.00 | $ 66,761.12 | [$ 14,354.14] | $690,000.00 |
| | $ 28,380.49 | $ 90,387.71 | $194,703.87 | | $ 66,761.12 | [$ 14,354.14] | $690,000.00 |
| | $114,155.49 | $301,159.66 | | $ 27,574.00 | | | |

GOVERNMENT EXHIBIT XX