**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Glen SHOFFNER, Richard Henry Fiedler, and Leonard Michael Stange, Defendants-Appellants.**

**Nos. 86–1045, 86–1071, 86–1226 and 86–1227.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 22, 1987.

Decided Aug. 11, 1987.

---

Barry Spevack, Paul Newman and Thomas H. Busch, Monico & Pavich, Chicago, Ill., for defendants-appellants.

John F. Hoehner, Asst. U.S. Atty., James G. Richmond, U.S. Atty., U.S. Atty.'s Office, Hammond, Ind., for plaintiff-appellee.

Before EASTERBROOK and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

These consolidated appeals arose out of a massive conspiracy trial involving a northern Indiana "chop shop" which was involved in stealing motor vehicles, disguising them, and then selling them. The allegations of the indictment, and the convictions resulting after a jury trial, involved: (1) conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371; (2) interstate transportation of stolen motor vehicles, in violation of 18 U.S.C. § 2312,[1] (3) receiving stolen motor vehicles which had been transported in interstate commerce, in violation of 18 U.S.C. § 2313,[2] and mail fraud, in violation of 18 U.S.C. § 1341. One of the appeals involves the conviction, following a separate trial, of one defendant for intimidating a witness, in violation of 18 U.S.C. § 1512(a)(2)(A).[3] Appellants, with one exception, were convicted of all counts with which they were charged.[4]

As might be expected in a case of this magnitude, there are numerous contentions of error on appeal. The primary contentions in the appeal regarding the conspiracy trial are that: (1) the conduct of the government informant was so outrageous as to violate Due Process; (2) the admission of certain statements made by Stange to a government informant violated Fed.R. Evid. 801(d)(2)(E); and (3) certain evidence gathered pursuant to a search warrant should have been suppressed because the warrant was not sufficiently specific to comply with the Fourth Amendment. The primary contention of error in the witness intimidation trial is that the admission of prior threats Stange had made regarding a witness to a third party violated Fed.R. Evid. 404(b).

For the reasons stated below, we find that there was no error in either of the

---

1. 18 U.S.C. § 2312 (1982) reads, *in extenso:*

   Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

2. 18 U.S.C. § 2313 (1982) reads, *in extenso:*

   Whoever receives, conceals, stores, barters, sells, or disposes of any motor vehicle or aircraft, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

3. 18 U.S.C. § 1512(a) (1982) reads, in pertinent part:

   Whoever knowingly uses intimidation or physical force, or threatens another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

   \*   \*   \*   \*   \*   \*

   (2) cause or induce any person to—
   (A) withhold testimony, or withhold a record, document or other object from an official proceeding;

   \*   \*   \*   \*   \*   \*

   shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

4. There were four defendants other than the appellants before us that were tried under the instant indictment. Clayton Jordan, the police officer who verified most of the vehicle identification numbers on the vehicles in question, and Ronald Fee, owner of one of the premises on which some of the vehicles were found, were acquitted. The jury was unable to reach a verdict with regard to Norwood Fitzgerald, whose limited involvement is described in the text, and Fee's live-in girlfriend, Lucilla Parrish.

trials or in the sentences imposed. Therefore, we affirm.

## I

Due to the factual complexity of this case (the transcripts of the two trials consume in excess of three thousand pages) and the comparatively straightforward nature of the contentions on appeal, we will endeavor to simplify our recitation of the facts of the case. Accordingly, we will discuss most of the facts in a simplified general fashion, amplifying only those facts necessary to our decision. Additional facts will be discussed, as necessary, in connection with our analysis of each of the contentions made by appellants.

### A. Conspiracy Trial

In general terms, the evidence showed a conspiracy to steal cars, mostly from the parking lot of a shopping mall in Orland Park, Illinois, and transport them to a body shop near LaPorte, Indiana. There, the vehicle identification numbers (VINs) of the vehicles were removed and replaced with vehicle identification numbers from wrecked or otherwise junked automobiles which had been purchased by the proprietor of the body shop, Glen Shoffner, at various salvage auctions. Sometimes, this was the only mechanical work done on the stolen vehicles (although they were sometimes painted as well), and sometimes other parts of the stolen vehicles were combined with parts from the salvage vehicles. The resulting "new" vehicle was then sold to a purchaser, with a title bearing the VIN of the salvage automobile. Because those titles were frequently from states other than Indiana, the purchaser was required to have the VIN verified by an Indiana law enforcement officer. Additionally, the purchaser, as is always the case in Indiana when a vehicle changes hands, applied to the Indiana Bureau of Motor Vehicles for a certificate of title in his or her name. Usually, the certificates were mailed to the purchaser from the Bureau of Motor Vehicles.

The government proved its case through several different types of evidence. First,

it generally called the victims of the automobile thefts, who each testified as to when and where his vehicle was stolen, and to the type of vehicle stolen. Also, the victims authenticated certified title histories of their vehicles, which bore the VINs of the stolen vehicles. In some cases, the victim witnesses identified photographs taken at the time a search warrant was executed on defendants Shoffner's and Ronald Fee's premises as depicting the vehicles which had been stolen from them.

Secondly, the government called witnesses who had purchased vehicles from the defendant Shoffner. These witnesses testified to the circumstances of the purchase and identified certified title histories of the vehicles they had purchased, most of which reflected that the vehicles to which the VINs on the purchased vehicles belonged were salvage vehicles of one type or another (witnesses from various salvage auction businesses and insurance companies also testified to the circumstances under which the salvage vehicles were purchased by Shoffner and their condition at the time of purchase).

The government also called as an expert witness Edward Skworch, a special agent of the National Automobile Theft Bureau ("NATB"). Skworch testified, in general terms, about VINs, stating that there were two types of identification numbers usually associated with a vehicle, a "public VIN" and a "confidential VIN." The public VIN of a vehicle normally appears on a plate in the dash of an automobile, visible through the windshield, and sometimes on a federally required safety sticker on the door or doorpost on the driver's side of the car. The confidential VIN of a vehicle may appear on various parts of an automobile (indeed, generally in more than one place), including the fire wall, engine, transmission, frame, and other places. From the confidential VIN, an expert can derive the "true VIN," that is, the public VIN that was placed on the vehicle by the manufacturer, by checking records maintained by the NATB. Skworch examined several of the vehicles seized on the Shoffner property to make such an analysis. For most

of the vehicles, he determined that the true VIN did not match the public VIN that then appeared on the car, and indeed matched the VIN of one of the vehicles that had been stolen. In some cases, he was unable to ascertain the true VIN because confidential VINs had been obliterated. In still other cases, although some confidential VINs had been obliterated, others remained intact allowing ascertainment of the true VIN, which, in most cases, matched that of a stolen vehicle. In addition, he offered an opinion that many of the vehicles had been "retagged" (connoting a mere change in the VIN) rather than "reconstructed" (connoting major mechanical work, usually building a single car from parts of other cars). Skworch testified that the purpose of "retagging" a vehicle was usually to conceal its true identity.

We will not attempt to catalogue the chain of evidence regarding each vehicle, as the government was required to do at trial (and, dismayingly, has done in a twenty-page statement of facts in its main brief), because with one exception, the defendants do not challenge the sufficiency of the evidence to support the verdicts. Instead we shall use two examples: a 1982 green Pontiac that defendant Leonard Michael Stange was convicted of transporting in interstate commerce (a conviction with respect to which he *does* challenge the sufficiency of the evidence), and one other example, a yellow-over-brown (two-toned) 1979 pickup truck, for purposes of comparison.

A green Pontiac was stolen from Michael Schoeling on March 6, 1984 from a parking lot in Orland Park, Illinois. A vehicle of the same general description, although bearing a different public VIN was seized by the Lake Station, Indiana, police on April 10, 1984. The vehicle seized had been observed parked in front of Stange's residence on March 23, 1984. At the time of the seizure, the vehicle was being driven by one Melvin Smeltzer, who was following a black tow truck being driven by Stange (towing a third vehicle and carrying Nor-

wood Fitzgerald as a passenger). The vehicles had all come from Stange's residence. The truck was stopped by police because it was towing a vehicle without using amber flashing lights required to be used by tow trucks under Indiana law and because it was speeding. Smeltzer stopped the Pontiac to see what the problem was. Upon examining the Pontiac's public VIN through the windshield, a police detective noticed that the VIN appeared to have been freshly painted. Additionally, upon opening the driver's door, the detective noticed that the federal safety sticker was missing. Smeltzer told police that the vehicle belonged to one of the occupants of the tow truck. On the bench seat of the tow truck, police noticed a confidential VIN tag that had been cut from a vehicle. At that point, both the Pontiac and the tow truck were seized.

Subsequent examination of the vehicle disclosed that its confidential VIN matched the stolen Schoeling vehicle, but its public VIN matched a burned salvage vehicle that had been determined "beyond economical repair" and sold to defendant Shoffner for $25. The vehicle was titled to defendant Richard Fiedler on February 9, 1984, and was registered in Fiedler's name at the time it was seized.

Stange's ex-wife,[5] Anita Smith, and a government informant, Ruth Ann Wright, both testified that they had seen the Pontiac in early 1984. (Smith's testimony as to the date seems to have been in error. She claimed to have seen the car in January of 1984, but it was at that time still in the possession of its rightful owner. However, Wright testified that she first saw the vehicle in mid-March.) Smith testified that she saw Stange driving the car and Fiedler following him in another car. After the car had been seized by police, Fiedler called her and told her to keep quiet about the car and "they can't pin nothing on nobody." Wright testified that Stange told her that the vehicle belonged to Fiedler and that it had come from Orland Park, Illinois.

---

**5.** Apparently Mrs. Smith's divorce from Stange was not final at the time of the trial. However, as there is no issue raised regarding either the marital communications privilege or the spousal testimonial privilege, this fact is irrelevant to our disposition of this case.

On January 6, 1984, a yellow-over-brown 1979 Ford pickup truck was stolen from Robert O'Neill from a parking lot in Northbrook, Illinois. A vehicle matching that same general description was seized from Clayton Jordan on June 26, 1984 after he voluntarily allowed police to examine it and they determined that it was stolen. Jordan had purchased the truck from the defendant Shoffner for an amount in excess of $3,000. At the time it was seized, the vehicle was registered to Jordan with a vehicle identification number matching the public VIN it then displayed on the dash. That public VIN on the truck matched that of a totally damaged 1979 Ford Pickup truck sold to Shoffner in June of 1983 for $622. Wright first saw this vehicle on the Shoffner property in March of 1984. Stange told her that he and Fiedler had stolen the vehicle in Northbrook, Illinois. Mr. O'Neill identified the truck as the one that had been stolen from him, and the confidential VINs on the vehicle confirmed this claim.

Wright was, without doubt, the most important witness to the government's case. In addition to testifying to certain acts she witnessed that tended to show an effort to conceal the true identities of some of the vehicles (e.g., grinding identification numbers off an engine) and her participation in an attempted theft of one vehicle and actual theft of another with the defendant Stange, Wright testified to numerous statements made by Stange that implicated himself and other defendants. Specifically Stange told her that he personally had stolen a number of the vehicles, and that he and Fiedler had stolen others. He also told her that he had removed the VINs from stolen vehicles at Shoffner's request and retagged them with VINs from the salvage vehicles.

Wright's participation in the case at the investigation stage was less than exemplary, to say the least. Wright, the daughter

of one defendant,[6] mother of another's child,[7] and niece of the defendant Shoffner, cultivated a romantic relationship, which ultimately became a sexual relationship, with the defendant Stange. The liaison with Stange resulted in an unwanted pregnancy, which was terminated with the financial assistance of the LaPorte County police department. Her credibility was a major issue at the trial, and defense counsel cross-examined her vigorously. We do not intend to second-guess the credibility determinations made by the jury with regard to her testimony.[8] We outline the above facts only because they are necessary to our discussion of Appellants' Due Process defense.

Much of the evidence adduced by the government at trial was the result of search warrants executed on the Shoffner property and the property of Ronald Fee on June 26, 1984. Defendants sought unsuccessfully to suppress the evidence, claiming that the warrants lacked the particularity required by the Fourth Amendment. The warrants directed the search for and seizure of "stolen motor vehicles, parts of stolen motor vehicles, tools and materials used to retag, dismantle and rebuild stolen motor vehicles and documentation concerning the purchase, sale, ownership, titling and licensing of stolen motor vehicles." The affidavits on which they were based detailed much of the information to which Wright would later testify at trial, mentioning 13 specific vehicles, many of which Stange had admitted to Wright that he had stolen and/or changed vehicle identification numbers on. These vehicles were described as being on the Shoffner property, the Fee property, or both (at different times, of course).

### B. Witness Intimidation Trial

While the conspiracy trial was in progress, the government subpoenaed Ani-

---

6. Parrish, with respect to whom the jury was unable to return a verdict, was Wright's mother.

7. Jordan, who was acquitted, had fathered Wright's child, who was about three years old at the time of the events in question.

8. The jury obviously chose not to believe all of Wright's testimony. If believed *in toto*, Wright's testimony would have convicted the defendants who were acquitted and those with regard to whom the jury could not reach a verdict.

ta Smith to testify. On the day following the service of the subpoena, Stange and his girlfriend, Annette Dragon, went to Anita's residence, ostensibly to visit Stange's children, who lived with Anita. During the visit, the subpoena was mentioned and Stange expressed a desire that Anita not testify because "[y]ou are the only thing that could get us put away." He suggested to her that she "just get up there and act like you don't know nothing." After Anita insisted that she would not perjure herself, Stange became angry and told her "you know I might get 40 years but you won't see one of them so you can't get up on the stand."

As a result of that incident, the government obtained an indictment against Stange for witness intimidation. At the witness intimidation trial, it was brought out that Stange had beaten Anita numerous times in the past. Therefore she took his threat seriously and contacted the United States Attorney's office. It was also brought out that Stange had told Wright, shortly after the search warrants had been executed in the investigation, that he was going to shoot Anita because she had been cooperating with the police. He also told Wright that when his lawyer obtained copies of a report (presumably the FBI 302s in the case) "we will be able to tell who the squealers are ... and when we do I feel sorry for them. I will tell you what—they will be shot before I go to Court."

Stange objected to this testimony on the basis of Fed.R.Evid. 404, and the district court instructed the jury that they could consider evidence of other misconduct on Stange's part only for purposes of evaluating his motive or intent, if at all.

### C. Convictions and Sentences

Following a jury trial in the conspiracy case, appellant Shoffner was convicted of conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371 (1982), two counts of receiving stolen motor vehicles transported in interstate commerce, in violation of 18 U.S.C. § 2313, one count of transportation of a stolen motor vehicle in interstate commerce in

violation of 18 U.S.C. § 2312, and four counts of mail fraud, in violation of 18 U.S.C. § 1341. He was acquitted on an additional mail fraud count. Shoffner was sentenced to five years on the conspiracy count and three years, plus a $5,000 fine, on each of the stolen vehicle counts, all to run consecutively to each other (for a total of 14 years and a $15,000 fine). On the mail fraud counts, he was sentenced to five years on each, to run concurrently with each other and with the sentences on the other counts, and supervised probation of three years to follow his release on the other counts.

Appellant Fiedler was convicted of conspiracy and one count of transporting a stolen motor vehicle in interstate commerce. He was sentenced to five years on each count, to run concurrently with each other.

Appellant Stange was convicted of conspiracy and six counts of transporting stolen motor vehicles in interstate commerce. He was sentenced to three years each on the conspiracy count and five of the transportation counts. In the separate witness intimidation trial, he was convicted of threatening a witness, in violation of 18 U.S.C. § 1512 and was sentenced to 10 years plus a special assessment of $50.00. All of Stange's sentences were to run consecutively, for a total of 28 years. Sentence was withheld on one of the transportation counts and five years supervised probation was imposed, to commence following Stange's release from the other sentences.

As we have noted above, appellants make numerous contentions of error. We first address those contentions involving the conspiracy trial.

### II

We first consider appellants' contention that the conduct of the government informant in this case was so outrageous that due process principles bar their convictions. Specifically, they focus on Wright's sexual relationship with Stange (and subsequent publicly financed abortion), and what they view as her abuse of the family relationships that she had with various of the

defendants. While we by no means condone Wright's behavior, or the government's behavior, we do not believe the actions of the government were so egregious that it was precluded from prosecuting the appellants.

The Supreme Court has left open the possibility that in some situations the government's conduct might be "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *See Hampton v. United States,* 425 U.S. 484, 491–95, 96 S.Ct. 1646, 1650–53, 48 L.Ed.2d 113 (1976) (Powell, J., concurring); *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). This circuit has likewise recognized that possibility. *United States v. Belzer,* 743 F.2d 1213, 1216–21 (7th Cir.1984), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 788, 83 L.Ed.2d 781 (1985); *United States v. Thoma,* 726 F.2d 1191, 1198–99 (7th Cir.), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *United States v. Kaminski,* 703 F.2d 1004, 1009–10 (7th Cir. 1983).

However, as we have recently noted, "we have not yet found conduct which was sufficiently outrageous to warrant the invocation of a due process bar." *United States v. Bruun,* 809 F.2d 397, 409 (7th Cir.1987) (citing *United States v. Podolsky,* 798 F.2d 177, 181 (7th Cir.1986)). Where no independent constitutional right is violated "governmental misconduct must be truly outrageous before due process will prevent conviction of the defendant." *Kaminski,* 703 F.2d at 1009; *see also Belzer,* 743 F.2d at 1217; *Thoma,* 726 F.2d at 1198.

■ We do not believe that appellants' contentions of government misconduct would justify reversal of the convictions in these cases. To begin with, it is not at all clear that the informant's behavior, particularly her sexual behavior, should be at-

tributed to the government. According to the record, as soon as the government learned that Wright had had a sexual liaison with Stange, it expressed strong disapproval and instructed her in no uncertain terms that the conduct was not to be repeated. The government cannot be held accountable for every unsavory act in which its informant engaged in this case.

Secondly, the fact that Wright was willing to inform on her family, while it may seem morally offensive to some, raises no constitutional issue. Law enforcement efforts must frequently turn on the willingness of insiders in a criminal operation to provide information. The fact that these insiders will sometimes be family members of those involved in the criminal enterprise should come as no surprise and is irrelevant to the constitutionality of such efforts.

■ Finally, the fact appellants seem to emphasize as the most "outrageous"—Wright's governmentally financed abortion—cannot have had an effect on the evidence the government gathered and adduced at trial. Regardless of whether Wright had a right to terminate her pregnancy, we question whether this was an appropriate use of police funds. However, our job is not to censure police officers for every act of questionable conduct in which they engage—we leave that to those with direct responsibility for supervision of the officers involved. Our job is to interpret the Constitution. Under the facts of this case, we do not believe it has been violated.[9]

### III

We also reject appellants' contentions that the statements made by defendant Stange to the government's informant Wright should have been excluded as inad-

9. We note that the trial court submitted the defendants' Due Process defense to the jury. As we recently held, whether government conduct is so outrageous as to bar conviction is a question of law for the court. *United States v. Swia-*

*tek,* 819 F.2d 721, 726 (7th Cir.1987). However, the submission of the defense to the jury could not have harmed the defendants here, as we have held that the government's conduct did not

missible hearsay.[10] The statements were properly admitted against the other defendants under the co-conspirator exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(E).[11]

Under that rule, statements made by a member of a conspiracy are admissible against other members of the conspiracy if made "during the course of and in furtherance of the conspiracy." In order to preserve the salutary purposes of the hearsay rule (including its implications for a defendant's Sixth Amendment right to confront the witnesses against him), we have required certain safeguards. For example, such statements can only be admitted " 'if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy....' " *United States v. Santiago*, 582 F.2d 1128, 1134 (7th Cir.1978) (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977)). Thus the government must show, by a preponderance of the evidence, that a conspiracy existed and that the defendant (or as in this case each of the defendants) was a member thereof. *United States v. Kaden*, 819 F.2d 813, 819 (7th Cir.1987) (quoting *United States v. Boucher*, 796 F.2d 972, 979 (7th Cir.1986) which in turn quoted *Santiago*, 582 F.2d at 1135).[12] Of course,

once the conspiracy is established, "only slight evidence is required to link a defendant to it." *United States v. Garver*, 809 F.2d 1291, 1295 (7th Cir.1987) (quoting *United States v. Williams*, 798 F.2d 1024, 1046 (7th Cir.1986) (Coffey, J. dissenting), which in turn quoted *United States v. Gironda*, 758 F.2d 1201, 1217 (7th Cir.1985)); *cf. Bruun*, 809 F.2d at 410–11 n. 16 (while only slight evidence of participation is required for admission of co-conspirator hearsay, defendant's participation must be proved beyond a reasonable doubt in order to convict) (citing *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) and *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)). We analyze the district court's "*Santiago* findings" under the "clearly erroneous" standard. *Kaden*, slip op. at 819; *United States v. Castillo*, 814 F.2d 351, 354 (7th Cir.1987); *United States v. Andrus*, 775 F.2d 825, 840 (7th Cir.1985) (citing *United States v. Williams*, 737 F.2d 594, 609 (7th Cir.1984)), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).

As appellants correctly note, in addition to demonstrating that the declarant and the defendant were members of a conspiracy, the government must also prove that the statements were made "during the course of and in furtherance of the conspir-

---

warrant invocation of the Due Process bar. Therefore, any error in this case was harmless.

**10.** Stange, of course cannot make this contention, since the statements were admissible against him without regard to the co-conspirator rule.

**11.** Fed.R.Evid. 801(d) provides, in pertinent part:

(d) Statements which are not hearsay. A statement is not hearsay if—

\* \* \* \* \* \*

(2) Admission by party-opponent. The statement is offered against a party and is ... (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

**12.** Following the oral argument in this case, the Supreme Court decided *Bourjaily v. United States*, — U.S. —, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), which substantially impacts on the consideration of coconspirator statements. The

law in this circuit, as enunciated in the cases cited in the test, had been that the determinations as to the existence of, and membership in, the conspiracy must be proven by "independent" evidence that is to say, exclusive of the declaration itself, lest inadmissible hearsay bootstrap itself into admissibility. *Bourjaily*, however, rejected any *per se* rule precluding use of the declarations in making the preliminary determinations, — U.S. at —, 107 S.Ct. at 2780–82, without deciding whether the statements could ever be the sole basis for their own admissibility, *Id*.

This case, however, does not require us to explore the precise contours of the new rule. As our discussion in the text makes clear, appellants challenge only the "furtherance" requirement, one which we have previously held may, indeed often must, be satisfied by the contents of the declarations themselves. In any event, both the existence of the conspiracy and the defendants' membership in it were, as the district court found, proven by a preponderance of the independent evidence.

acy." Mere conversations of conspirators are thus not admissible. *United States v. Tille,* 729 F.2d 615, 620 (9th Cir.) (quoting *United States v. Layton,* 720 F.2d 548, 555 (9th Cir.1983)), *cert. denied,* 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984). It is the furtherance element that appellants contend was missing in this case. We disagree.

■ We do not believe that the finding that Stange's statements to Wright furthered the conspiracy is "clearly erroneous." The statements were made to Wright in April and May of 1984. During the month of May, Wright was recruited by Stange (and possibly by defendant Parrish) to participate in the theft of vehicles. It is firmly established that "[c]onversations made by conspirators to prospective co-conspirators for membership purposes are acts in furtherance of the conspiracy." *United States v. Dorn,* 561 F.2d 1252, 1257 (7th Cir.1977) (citing *United States v. Halpin,* 374 F.2d 493, 495 (7th Cir.1967) and *United States v. Nardone,* 106 F.2d 41, 43 (2d Cir.), *rev'd on other grounds,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939)).

This court faced a situation similar to the one at bar in *United States v. Kendall,* 665 F.2d 126 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982). There, one defendant had recounted what had transpired at a meeting of co-conspirators to his brother. Shortly thereafter, the brother joined in soliciting funds for the conspiracy. Accordingly, we held that "[b]ecause this joint solicitation effort followed closely [the defendant's] discussion of the meeting with his brother, that declaration can be viewed as being in furtherance of the conspiracy." 665 F.2d at 133. We distinguished *United States v. Eubanks,* 591 F.2d 513 (9th Cir.1979) (per curiam), relied on by the appellants here, noting that in *Eubanks,* "[t]he statements pertained to events that had already occurred.... There was no indication that [the declarant's] actions were shaped by his talks with [the witness]. Similarly, there was no indication that [the witness] acted on behalf of the conspiracy as a result of these conversations." *Id.*

We believe that this case resembles *Kendall,* rather than *Eubanks.* We realize that many of the statements made by Stange to Wright "pertained to events that had already occurred." Nonetheless, there were also indications that Stange's "actions were shaped by his talks with" Wright and that Wright "acted on behalf of the conspiracy as a result of these conversations."

Of course, Stange may also have confided in Wright, as appellants contend, for his own personal reasons. But he appears to have made the statements, at least in part, to induce her to join the conspiracy. The statements need not have been exclusively, or even primarily, made to further the conspiracy. For example, in *United States v. Mackey,* 571 F.2d 376, (7th Cir.1978), we held the statement admissible as made in furtherance of the conspiracy even though "the statement [was] susceptible of alternative interpretations...." *Id.* at 383. "The standard to be applied is whether some reasonable basis exists for concluding that the statement furthered the conspiracy." *Id.* (citing *United States v. Moore,* 522 F.2d 1068, 1077 (9th Cir.1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976) and *United States v. Knippenberg,* 502 F.2d 1056, 1061 (7th Cir. 1974)); *see also United States v. Xheka,* 704 F.2d 974, 985 (7th Cir.1983).

Given the plausible interpretation the government advances of Stange's purpose for making the statements, the relatively low burden of proof the government had to meet to establish the admissibility of the declarations, and the deferential standard we apply to review of such questions, we conclude that the finding that the statements were in furtherance of the conspiracy is not "clearly erroneous."

■ We are concerned, however, with the procedures followed below. Unlike the other determinations required by *Santiago* and its progeny, the question of whether a statement was in furtherance of the conspiracy "must of necessity take into account the contents of the statement." *Xheka,* 704 F.2d at 986. Thus, it cannot be made on the basis of a preponderance of the independent evidence. This leaves a

trial court with several options. It can rule that certain statements were or were not in furtherance of a conspiracy as the statements are brought out at trial; it can require the government to make a proffer of the evidence it believes establishes the furtherance requirement or it can defer this ruling until the close of the government's case when, having heard all the evidence, it can make a hindsight determination that the requirement has been met. *See Andrus*, 775 F.2d at 837. Here the district court followed in part the first and third courses.

At the time the district court made its initial *Santiago* rulings, it indicated that they were subject to reexamination in the event that the furtherance requirement was not met. On the trial day prior to that on which Wright testified, the court told all the parties the course it would take:

> .... Once the Court determines the probable existence of the conspiracy and the participation of the defendant and declarant the defendant may still move the Court to reconsider after the presentation of all the evidence the ultimate finding of a statement made in furtherance of the conspiracy for purposes of 801(d)(2)(E). It must be based on all the evidence admitted at the trial.

Tr. 1415.

The court then entertained argument from the parties. Each defendant naturally argued that the government had not produced sufficient evidence to tie him or her to the conspiracy. Additionally, Shoffner noted that many of the statements might not be in furtherance of the conspiracy, and outlined the theory that Stange had confided in Wright for other reasons. The court responded "[w]e will cross all of the bridges just as carefully as I know how to do. When we get there. I haven't got there yet." Tr. 1422.

On the following day Wright took the stand, and before she began to relate statements Stange made to her a timely objec-

tion, based on the furtherance requirement, was made. A lengthy colloquy followed. The defendants each reiterated their theory of why the declarations were not in furtherance of the conspiracy. The government then set forth its theories of admissibility, primarily by citing to the district court some of the cases which we have discussed above. Additionally the government gave the following explanation:

> All of these cases would stand for the proposition that co-conspiracy statements are admissible for a variety of reasons not the least of which is to identify the co-conspiracy.... to define the conspiracy itself.... to in fact admit relevant testimony in regard to the review of the conspiracy in regard to the planning.... and in regard to the recruitment of others to join that conspiracy.

Tr. 1448.[13]

The government did not, however, indicate to the trial court the proof that it hoped to elicit to support those theories. The trial court, after listening to all of the arguments and specifically indicating that it understood them, overruled the objection. As we have indicated above, subsequently introduced evidence did in fact show that the statements were made, at least in part, to induce Wright to join the conspiracy.

At the close of the government's case, all defendants moved for judgments of acquittal. Several expressly asked the district court to reconsider its *Santiago* rulings, although none explicitly referred to the furtherance requirement. Because none of the defendants focused on that requirement, neither did the government or the district court. However, the district court did expressly decline, in general terms, to reconsider its earlier *Santiago* rulings.

■ We set forth the procedures surrounding this issue in what may seem excruciating detail for a reason. While the order of proof on issues such as these rests within the sound discretion of the trial court, *cf.* Fed.R.Evid. 104(b) (where rele-

---

13. We note that we are uncertain how some of the theories expressed by the government in the passage of the trial record quoted in the text would support a conclusion that the statements were in furtherance of the conspiracy. Therefore, we express no opinion whether any of the theories contained therein, other than the recruitment theory, are sufficient.

vancy of evidence is conditioned on other facts the trial court may allow the evidence upon proof of, or subject to later proof of, such facts), the course followed below could have been hazardous. The trial court essentially took on faith the government's assertion that the statements were made in furtherance of the conspiracy. While we by no means intend to impugn the integrity of the United States Attorney's office, it was possible that such evidence would not have materialized. Had that occurred, the probable result would have been a costly mistrial. We suggest that a preferable procedure would be to at least require the government to preview the evidence which it believes brings the statements within the co-conspirator rule. As we have noted, the evidence produced did in fact validate the government's assertion. Therefore, the admission of the declarations was not error.[14]

## IV

We also reject appellants' argument that the evidence seized pursuant to the search warrants should have been suppressed because the warrants were not sufficiently particular to comply with the demands of the Fourth Amendment. The warrant itself described the items to be searched for and seized as:

Stolen motor vehicles, parts of stolen motor vehicles, materials used to retag, dismantle and rebuild stolen motor vehicles and documentation concerning the purchase, sale, ownership, titling and licensing of stolen motor vehicles.

We believe this description was sufficiently specific to satisfy the demands of the Fourth Amendment.

The Fourth Amendment requires that "... No warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. 4. While litigated less often than the "probable cause" requirement of the Amendment, the particularity requirement, too, serves an important function. The requirement was a direct response to the evil of the general warrant, one of the abuses by the Crown that lead to the American revolution:

.... "[T]he problem [posed by the general warrant] is not that of intrusion *per se*, but of a general exploratory rummaging in a person's belongings.... [The Fourth Amendment addressed the problem] by requiring a 'particular description' of the things to be seized."

*Andresen v. Maryland*, 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971)) (alterations the Court's).

Thus, "[a] search warrant must describe the objects of the search with reasonable specificity, but need not be elaborately detailed." *United States v. Reed*, 726 F.2d 339, 342 (7th Cir.1984). Nor must the warrant "enable authorities 'to minutely identify every item for which they are searching.'" *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984) (quoting *United States v. Prewitt*, 553 F.2d 1082, 1086 (7th Cir.), *cert. denied*, 434 U.S. 840, 98 S.Ct. 135, 54 L.Ed.2d 104 (1977)). "Thus a description is valid if it is as specific as the circumstances and the nature of the activity under investigation permit." *Unit-*

---

14. Defendants also argue that even if the statements were admissible under Rule 801, their admission violated defendant's rights under either *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and its progeny or the Confrontation Clause itself. As *Bruton* was based on the Confrontation Clause, we do not view these "two" arguments as analytically distinct. This court has held too many times to require extended discussion that where a statement is admissible under Rule 801(d)(2)(E), there can be no Confrontation Clause violation. *E.g. United States v. Balistri-*

*eri*, 779 F.2d 1191, 1223 (7th Cir.1985). The Supreme Court appears to have sanctioned this *per se* rule in two recent cases. *See Bourjaily, supra* note 12 at 627 and 107 S.Ct. at 2782–83 (once statement meets requirements of co-conspirator declaration rule, no independent showing of reliability required); *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986) (Confrontation Clause does not require unavailability of the declarant as a prerequisite to the admission of coconspirator statements). Accordingly, we once again decline the invitation to overrule our many cases so holding.

ed States v. Blum, 753 F.2d 999, 1001 (11th Cir.1985) (citing *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983)).

Suffice it to say that we and other courts have approved warrants at least as general as the one attacked here. *See United States v. Bentley*, 825 F.2d 1104, 1109–10 (7th Cir.1987) ("every business paper"); *United States v. Peters*, 791 F.2d 1270, 1278–79 (7th Cir.1986) ("gems, narcotics and currency"); *United States v. Vanichromanee*, 742 F.2d 340, 347 (7th Cir. 1984) ("documents, papers, receipts and other writings which are evidence of a conspiracy to violate" 21 U.S.C. § 963); *Reed*, 726 F.2d at 342 (proof of residency); *United States v. Malik*, 680 F.2d 1162, 1165 (7th Cir.1982) ("books, papers, [and] documents" and baseballs and other items shipped from Pakistan as part of a heroin importation conspiracy); *see also United States v. Strand*, 761 F.2d 449, 452–53 (8th Cir.1985) ("stolen mail which is evidence of and the fruits of the crime of theft from the mail"); *Blum*, 753 F.2d at 1001 ("Porcelain ware, toys, furniture, baby products and miscellaneous merchandise fraudulently obtained from vendors throughout the United States."); *United States v. Gomez-Soto*, 723 F.2d 649, 652–53 (9th Cir.1984) ("representative original samples of handwriting," documents indicative of defendant's residence or citizenship, records of international travel, documents relating to any business transactions of defendant or his three corporations for the previous five years).

Appellants rely on *United States v. Le-Bron*, 729 F.2d 533 (8th Cir.1984) and *United States v. Fuccillo*, 808 F.2d 173 (1st Cir.1987). In *Lebron*, the warrant authorized a search for, among other things, "other property, description unknown, for which there exists probable cause to believe it to be stolen" and "any records which would document illegal transactions involving stolen property." After locating the items specifically named in the warrant (some electronic equipment), the executing officers continued a general exploratory search of precisely the type the Fourth Amendment is intended to prevent and located unrelated contraband (unregistered firearms) in a location which was not even likely to harbor the specified items. The case is plainly distinguishable both in terms of the breadth of the description (it did not even specify what *type* of stolen property was sought) and the conduct of executing officers.

*Fuccillo* is closer to the instant case, in that the warrant authorized the seizure of "cartons of women's clothing, the contents of those cartons, lists identifying the contents of the cartons, and control slips identifying the stores intended to receive these cartons, such items being contraband and evidence of" possession of goods stolen from interstate shipments. When executing the warrant, FBI agents asked the owner of the warehouse to indicate which goods were legitimate. When he declined to answer, they seized the entire contents of the warehouse. The First Circuit held that the description was insufficient because the FBI had more particular information regarding the labels which would appear on such clothing, the specific type of women's clothing, and the stores which would be designated on the control slips.

In this case however, a more particular description could preclude effective investigation of the crimes at issue. The affidavit in this case averred a continuing criminal scheme involving stolen automobiles. Law enforcement authorities had every reason to believe that some of the vehicles named in the affidavit would no longer be on the premises when they executed the search warrant, and that others would have been added. In sum, the warrant in this case was as "specific as the nature of the activity under investigation permit[ted]." *Blum,* 753 F.2d at 1001.

The particularity requirement of the Fourth Amendment is to be applied with a practical measure of flexibility and only requires reasonable specificity. The warrant described the categories of items to be seized sufficiently to circumscribe the discretion of the officers executing the warrant. It did not authorize a general

search. For example, the officers clearly would not have been justified looking in most parts of any common personal residence under the warrant (unless, of course, there was some indication that documents might be hidden there), and it would be fairly easy to tell whether an item came within the categories described in the warrant (for example, the officers could not have confiscated appellants' personal jewelry to see if they could find out whether some of it had been stolen). The purpose of the particularity requirement is to circumscribe the search, giving notice to both the executing officers and the person on whom the warrant is served of the limits of the officers' authority. *See In re Lafayette Academy, Inc.*, 610 F.2d 1 (1st Cir. 1979) (citing *United States v. Marti*, 421 F.2d 1263, 1268 (2d Cir.1970)). The warrants at issue here did so.[15]

## V

Finally Stange contends that the evidence was insufficient to support his conviction on one of the transportation charges, the one involving a green Pontiac. In evaluating this challenge, we note that an appellant who challenges the sufficiency of the evidence to sustain a jury verdict of conviction bears a heavy burden. *United States v. Fulk*, 816 F.2d 1202, 1206 (7th Cir.1987); *United States v. Bruun*, 809 F.2d 397, 408 (7th Cir.1987); *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983) (citing *United States v. Garcia*, 562 F.2d 411, 414 (7th Cir.1977), and *Brandom v. United States*, 431 F.2d 1391, 1400 (7th Cir.1970), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 634 (1971)), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984). We review the evidence in the light most favorable to the government and must sustain the verdict if " '*any* rational trier of fact could have found guilt beyond a reasonable doubt.' " *United States v. Reynolds*, 801 F.2d 952, 954 (7th Cir.1986) (quoting *Jackson v. Vir-*

*ginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). Because Stange has not met this heavy burden, we reject his challenge.

As we have noted above, the automobile in question was observed outside Stange's residence, in Indiana, shortly after its theft from Illinois. Smeltzer identified it as belonging to one of two occupants, including Stange, in the tow truck. The car was titled in Fiedler's name, but there was evidence that Fiedler held the title only as security for a loan he had given Stange. Additionally, Wright testified that Stange had told her that the car had come from Orland Park, Illinois (the location from which it was in fact stolen).

Stange makes much of the fact that there was no evidence that he ever told Wright that he, personally, stole the car. However, this is not conclusive. From the other statements he made to her, the jury could infer that Stange was the member of the conspiracy who was responsible for the actual theft of the vehicles. This, coupled with the fact that he was in possession of the car in Indiana shortly after its theft in Illinois was sufficient to enable the jury to infer that Stange had transported it in interstate commerce, knowing it to have been stolen. *Cf. Bruun*, 809 F.2d at 404–05 (mere receipt of securities in Chicago after their theft in New York insufficient, under the circumstances, to prove beyond a reasonable doubt that defendant transported them in interstate commerce).[16]

## VI

### Appeal No. 86–1227: The Witness Intimidation Trial.

In this appeal, Stange challenges the admission of "prior acts" evidence regarding threatening his wife, the sufficiency of the evidence against him, and his sentence. The only issue he raises of sufficient merit to warrant discussion is that relating to

---

15. Because we hold that the description in the warrant itself was sufficient, we need not consider the government's argument that the affidavit was "incorporated" into the warrant.

16. We have considered the other issues raised by appellants regarding the conspiracy trial and find them to be without sufficient merit to warrant discussion.

633

"similar acts" evidence.[17] Even with respect to this challenge, however, we find no error.

 Under Fed.R.Evid. 404(b) other acts of misconduct of the accused may not be used to show his character in order to show "that he acted in conformity therewith," but may be admissible to show other things "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *See generally United States v. Beasley*, 809 F.2d 1273 (7th Cir.1987). This court has established guidelines for the admissibility of such evidence to assure that the purposes of the rule are carried out. Such evidence is admissible only if: (1) it is directed toward establishing a matter in issue other than the defendant's propensity to commit the offense charged; (2) it is similar enough and close enough in time to be relevant to the matter in issue; (3) it is clear and convincing; and (4) its probative value is not substantially outweighed by the danger of unfair prejudice. *United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir.1984); *see also United States v. Fakhoury*, 819 F.2d 1415, 1420 (7th Cir.1987). Our standard of review of such questions is the "abuse of discretion" standard. *Id.*

We do not believe the trial court's decision to admit evidence of threats regarding the victim in this case which Stange had made to a third party shortly after the execution of the search warrants, carefully limited to the question of Stange's motive or intent, was an abuse of discretion. Stange's position at trial (and his argument regarding the sufficiency of the evidence on appeal) was that his statement to his estranged wife that "I might get 40 years but you won't see one of them, so you can't get on the stand" was not seriously meant as a threat. This bolsters the conclusion that intent was in issue, and the prior threats seem probative of it. We see no error here.

17. We have considered Stange's other challenges and find them to be without merit. The evidence was plainly sufficient, given our standard of review. Additionally, his sentence was

VII

For the reasons stated above, the convictions and sentences are

AFFIRMED.

within statutory limits and our review discloses no improper factors considered by the trial court.