**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Fred SHORES, Jr., Defendant–Appellant.**

**No. 93–5454.**

United States Court of Appeals,
Fourth Circuit.

Argued June 10, 1994.

Decided Sept. 6, 1994.

Atty., Florence, SC, for appellee.  **ON BRIEF:** J. Preston Strom, Jr., U.S. Atty., Charleston, SC, for appellee.

Before ERVIN, Chief Judge, PHILLIPS, Senior Circuit Judge, and JACKSON, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion.  Senior Judge PHILLIPS wrote the opinion, in which Chief Judge ERVIN and Judge JACKSON joined.

## OPINION

PHILLIPS, Senior Circuit Judge:

Fred Shores, Jr. appeals his conviction for causing another to travel in or use the facilities of interstate commerce with intent that a "murder for hire" be committed, in violation of 18 U.S.C. § 1958.  His only substantial claim is that the district court erred in refusing to grant his motion for severance after admitting evidence of out-of-court statements made by his non-testifying co-defendant, which incriminated him, at their joint trial.  We affirm.

### I.

Shores was convicted of murder in North Carolina state court and was sentenced to life plus ten years.  He later pled guilty to an unrelated federal charge and was sentenced to an additional seven years in prison.  In July 1992, he was sent to the federal penitentiary in Leavenworth, Kansas, a maximum-security facility, to serve his federal sentence.  While there, he met a man named Frederick Veselosky, who was then serving time for armed bank robbery.

Veselosky was paroled from Leavenworth in November of 1992.  About six weeks later, he called the FBI and told them that Shores had offered him $5000 to kill Rita Durham, whose daughter had testified against Shores in his North Carolina murder case.  Veselosky told the FBI that he had agreed to kill Durham for Shores, that Shores had given him a map with directions to Durham's home, and that Shores had arranged for him to pick

**ARGUED:** John Herman Hare, Asst. Federal Public Defender, Columbia, SC, for appellant.  Alfred W. Bethea, Jr., Asst. U.S.

up his $5000 from a man named Charles Ellis, who lived in South Carolina, when he successfully completed the murder.

The FBI asked Veselosky to help them build a case against Shores and Ellis, by acting as if he were going through with the murder plot. He agreed to do so. At the direction of the FBI, Veselosky sent a note to Shores in prison telling him that he would do the job for him; made a series of phone calls to Ellis, which were recorded by the FBI; and finally met with Ellis, armed with photographs of Rita Durham that had been doctored to indicate she was dead, and induced him to hand over the $5000. Ellis was arrested immediately thereafter, and he and Shores were charged with inducing Veselosky to commit "murder for hire," in violation of 18 U.S.C. § 1958.

While Shores and Ellis were awaiting arraignment on these charges in a South Carolina jail, Ellis was placed in a cell with William Rhodes. Shortly thereafter, Rhodes told law enforcement authorities that Ellis had made some incriminating statements to him.[1] According to written statements that Rhodes gave the FBI, Ellis told him, among other things, that he and Shores had been involved in a "murder for hire" plot whose intended victim was Rita Durham; that his role in the plot had been to pay Veselosky $5000 after he killed Durham; and that he did in fact pay Veselosky the $5000 after Veselosky showed him pictures of what he thought was Durham's corpse. Rhodes also told the FBI that Ellis had told him that he and Shores were paying a guard to let Ellis into Shores' cell at night so they could plan their strategy; that they were planning to subpoena five to seven Leavenworth prisoners to testify for them at trial; that these prisoners were going to give perjured testimony indicating that Shores had not hired Veselosky to kill Durham, but only to rob her, and that they were going to help Shores and Ellis escape from jail while they were in South Carolina; that he and Shores wanted to have Veselosky killed before their case went to trial to prevent him from testifying

against them and would pay someone between $7,500 and $10,000 to do so; and that Shores also intended to have two other persons who had offered evidence against him in his North Carolina murder case killed.

The FBI gave Rhodes a polygraph test concerning his statements about his conversations with Ellis. Rhodes passed the test. The credibility of his statements was further bolstered when Shores did in fact subpoena a number of Leavenworth prisoners to testify for him at trial, and several of those prisoners actually tried to escape before the trial began, just as Rhodes had told the FBI that Ellis said they would. Following this escape attempt, but before the trial actually began, the government brought Rhodes' statements about his conversations with Ellis, as well as the evidence of the abortive escape attempt by the defense witnesses, to the attention of the district court. The information was presented to the court in an *ex parte* hearing, pursuant to Fed.R.Crim.Proc. 16(d)(1), because the government wanted permission not to disclose it to the defense. At this hearing, the government gave the district court copies of Rhodes' written statements to the FBI.

At trial, the government called Rhodes to the stand during its case-in-chief to testify about what Ellis had told him in jail. Defense counsel immediately pointed out that this testimony might present Confrontation Clause problems under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), if Ellis did not testify himself. On the assumption that Ellis would testify, however, the court permitted the government to elicit some limited testimony from Rhodes about his conversations with Ellis. Rhodes then testified that Ellis had told him that he and Shores were involved in a "murder for hire" plot; that his role in the plot was to give Veselosky $5000 for killing Rita Durham; and that he had paid Veselosky the $5000 after being shown pictures of an apparently-dead Rita Durham. On cross-examination, Rhodes also testified that while Shores and Ellis were awaiting arraignment in South Carolina, they were paying a guard

---

1. Shores has not argued that Rhodes was acting as an agent of the government in inducing Ellis to make these statements, and there is no evidence in this record to support such an argument.

to let Ellis into Shores' cell at night, so they could hold strategy sessions. Rhodes did not give any further testimony before the jury about what Ellis had told him.

Shores' defense at trial was exactly what Rhodes had told the FBI that Ellis said it would be: that he had hired Veselosky to rob Durham, rather than to kill her. To support this defense, he called five Leavenworth prisoners, all of whom testified that they had overheard Shores and Veselosky planning to rob Durham, rather than to kill her, just as Rhodes had told the FBI that Ellis said they would. Ellis did not testify in his own defense, nor did he put on any other evidence. Instead, he relied solely on the argument that the government's evidence was legally insufficient to prove beyond a reasonable doubt that he knew that Veselosky was being paid $5000 to commit a murder, rather than for some other reason.

At the close of all the evidence, when it became clear that Ellis was not going to testify, Shores moved for severance, arguing that he had been denied his Sixth Amendment right of confrontation when Ellis' incriminating statements were admitted against him through the testimony of Rhodes, since Ellis did not take the stand himself and thus was not available for cross-examination. The government responded that the admission of these particular statements by Ellis did not present Confrontation Clause problems because they were admissible against Shores under the co-conspirator exception to the hearsay rule. The district court initially expressed skepticism about the government's argument, saying that it found no evidence in the record that the original "murder for hire" conspiracy between Shores and Ellis had continued after Ellis was arrested, that Shores and Ellis were involved in any later-formed conspiracy at the time Ellis made the statements in question, or that Ellis made those statements to Rhodes in furtherance of any such conspiracy. But the court recalled Rhodes to the stand and permitted the parties to examine him, out of the presence of the jury, to determine whether

Ellis did in fact make the statements in question during the course of and in furtherance of a conspiracy between himself and Shores.

On recall, Rhodes testified that Ellis told him that he and Shores wanted to have Veselosky killed before their trial so that he could not testify against them and that they had gotten Veselosky's home and work addresses toward that end; that Ellis asked Rhodes if he knew anyone who could make the hit for them and how much he thought it would cost them; and that Ellis said he wished Rhodes were getting out of jail in time to do it for them.[2] Rhodes also testified that Ellis told him that Shores intended to have two other witnesses who had testified against him in his North Carolina murder case killed; that he and Shores were planning to bring seven prisoners from Leavenworth to South Carolina to testify for them at trial; that the prisoners were going to give false testimony that they heard Shores tell Veselosky that he would pay him $5000 to rob Durham, rather than to murder her; and that they were going to help Shores and Ellis escape while they were in town.

After hearing this testimony and argument from the parties, the district court ruled that the statements made by Ellis which had been earlier introduced against Shores did not present Confrontation Clause problems, because they were admissible against Shores under the coconspirator exception to the hearsay rule. The court supported this ruling with specific findings, based on both Rhodes' testimony and the other evidence in the record, that the government had proved by a preponderance of the evidence that there was a conspiracy between Shores and Ellis at the time Ellis made the statements in question, and that those statements were made in furtherance of that conspiracy. Specifically, the court found that Ellis and Shores had "joined together to commit and aid and abet in the commission of a murder for hire, to be accomplished by Mr. Veselosky[,] . . . that at the time Mr. Ellis talked to

---

**2.** It was unclear from Rhodes' testimony whether Ellis had actually tried to hire Rhodes himself to kill Veselosky. Rhodes said at one point that Ellis was trying to get him to do the job if he got out in time. At another point, however, he said that while Ellis said he would like him to do the hit, he knew that he could not, because he would not be getting out of jail in time.

Mr. Rhodes ... [,] Mr. Ellis was aware of the fact that Mr. Veselosky had double-crossed him and Mr. Shores and caused his arrest[,] ... [a]nd ... that he attempted to enlist Mr. Rhodes' aid to further the conspiracy by having Mr. Veselosky killed." JA 483. The court rejected Shores' argument that Ellis could not have intended his statements to Rhodes to further the objectives of this conspiracy, because he knew that Rhodes would not be getting out of jail in time to kill Veselosky himself. The court reasoned that "[t]he inference could be made to the contrary," and that "[o]bviously, Mr. Ellis attempted to enlist Mr. Rhodes' aid in some way in furthering the conspiracy in that manner, and thereby ... invited Mr. Rhodes to become a member of the ongoing conspiracy." JA 483–84. The court therefore denied Shores' motion to sever.

The jury acquitted Ellis, but found Shores guilty as charged. Shores now appeals.

## II.

■ Shores' principal argument on appeal is that the district court committed reversible error in denying his motion for severance. He contends that the admission of evidence of his non-testifying codefendant Ellis' statements to Rhodes about the "murder for hire" plot, which strongly incriminated him, violated his Confrontation Clause rights, and that the district court was therefore required to sever his trial from Ellis' and, presumably, to declare a mistrial with respect to him. We disagree.

■ *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), holds that a defendant's sixth amendment right to confront the witnesses against him is violated when an out-of-court statement from his co-defendant, which incriminates the defendant, is admitted into evidence at their joint trial, at which the co-defendant does not testify. *Id.* at 127–28, 88 S.Ct. at 1623. We have held, however, that the *Bruton* rule does not apply if the nontestifying co-defendant's statement is admissible against the defendant under the co-conspirator exception

to the hearsay rule set forth in Federal Rule of Evidence 801(d)(2)(E). *Folston v. Allsbrook,* 691 F.2d 184, 187 (4th Cir.1982), *cert. denied,* 461 U.S. 939, 103 S.Ct. 2111, 77 L.Ed.2d 314 (1983); *see United States v. Brooks,* 957 F.2d 1138, 1146 (4th Cir.), *cert. denied,—* U.S. ——, 112 S.Ct. 3051, 120 L.Ed.2d 917 (1992). Under Rule 801(d)(2)(E), a statement of the defendant's co-conspirator is admissible against the defendant if it was made "during the course of and in furtherance of the conspiracy." As interpreted, the Rule permits admission of a coconspirator statement if the court finds (i) that the defendant and the declarant were involved in a conspiracy with each other at the time the statement was made;[3] and (ii) that the statement was made in furtherance of that conspiracy. *See United States v. Blevins,* 960 F.2d 1252, 1255 (4th Cir.1992); *Brooks,* 957 F.2d at 1146 n. 8. The party seeking to introduce the co-conspirator statement bears the burden of establishing these preliminary facts for admissibility, but it need only do so by a preponderance of the evidence. *Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144 (1987). In resolving these preliminary factual questions for admissibility, the court may consider *all* evidence before it, whether admissible at trial or not, including the co-conspirator statements sought to be admitted. *Id.* at 176–81, 107 S.Ct. at 2779–81. We review the district court's findings of fact with respect to these threshold criteria for admission under the clearly erroneous standard. *Id.* at 181, 107 S.Ct. at 2781; *see Blevins,* 960 F.2d at 1255.

■ In making its preliminary factual findings under Rule 801(d)(2)(E), the district court properly considered Rhodes' various accounts of Ellis' statements to him (including both his in-court testimony and his earlier statements to the FBI, which had been presented to the court in the *ex parte* hearing), as well as the testimony of other witnesses, both before the jury and outside its presence. After reviewing that evidence in its entirety, we cannot say that the district

---

3. The conspiracy which supports the admission of the co-conspirator's statement need not be charged in the indictment. *United States v. Lay-*

ton, 855 F.2d 1388, 1398 (9th Cir.1988), *cert. denied,* 489 U.S. 1046, 109 S.Ct. 1178, 103 L.Ed.2d 244 (1989).

court's finding with respect to the first 801(d)(2)(E) factor—that Ellis and Shores were involved in a conspiracy with each other at the time Ellis made the statements in question—was clearly erroneous. Rhodes' testimony demonstrated that at the time Ellis made the statements in question, he and Shores were conspiring with each other to commit various illegal acts: they were paying a guard to let Ellis into Shores' cell at night, so they could plan their defense strategy; they were planning to have Veselosky killed to prevent him from testifying against them; they were planning to bring prisoners from Leavenworth to South Carolina to give perjured testimony at their trial; they were planning to escape from jail with the help of those prisoners; and they were planning to kill two other persons who had testified against Shores in his North Carolina murder case. The district court concluded, after observing Rhodes' demeanor in court and considering his passage of a polygraph examination, that this testimony was entitled to great weight, and we see no reason to doubt its judgment on this score. *See Bourjaily*, 483 U.S. at 181, 107 S.Ct. at 2781 (in making admissibility determination under Rule 801(d)(2)(E), the court should give the out-of-court co-conspirator statement sought to be admitted "such weight as his judgment and experience counsel") (internal quotations omitted). But the district court's finding that a conspiracy existed was not solely on Ellis' out-of-court statements, as related by Rhodes. There was also substantial independent evidence corroborating Rhodes' testimony about the existence of the conspiracy: the United States Marshal's testimony that the Leavenworth prisoners called as defense witnesses did in fact try to escape while they were waiting to testify, just as

Rhodes had told the FBI that Ellis said they would; and the fact that Shores actually presented testimony from those prisoners indicating that he had hired Veselosky to rob Durham, rather than to kill her, just as Rhodes had told the FBI that Ellis said he would.[4] On this record, we cannot say that the district court's finding that Shores and Ellis were involved in a criminal conspiracy at the time Ellis made his incriminating statements to Rhodes was clearly erroneous. Whether that conspiracy is best characterized as a continuation of the original conspiracy between Ellis and Shores to murder Durham, *see United States v. Potamitis*, 739 F.2d 784, 787–88 (2d Cir.) (single conspiracy may encompass not only commission or attempted commission of crime, but also its concealment and obstruction of justice concerning its investigation and prosecution), *cert. denied*, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984), or as a separate but related conspiracy to obstruct justice in their "murder for hire" trial, formed sometime after Ellis' arrest, is of no consequence to the Rule 801(d)(2)(E) inquiry.

■ The dispositive question is thus whether the district court's finding with respect to the second Rule 801(d)(2)(E) factor—that the statements in question were made "in furtherance" of the conspiracy between Shores and Ellis then in existence—was clearly erroneous. A statement by a co-conspirator is made "in furtherance" of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect. *See United States v. Nazemian*, 948 F.2d 522, 529 (9th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992); *United States v. Wolf*,

---

4. Because the district court's finding that a conspiracy existed between Ellis and Shores at the time the statements in question were made was based in part on this independent evidence, we need not decide whether Ellis' statements, standing alone, would have been sufficient to support such a finding. *See Bourjaily*, 483 U.S. at 181, 107 S.Ct. at 2781 (expressly reserving question whether finding that conspiracy existed between defendant and declarant may be based *solely* on the co-conspirator statement sought to be admitted). Prior to *Bourjaily*, the law in this circuit was that the existence of a conspiracy between the defendant and the declarant must be proved

by a preponderance of the evidence *independent* of the co-conspirator statement sought to be admitted, so that inadmissible hearsay could not "bootstrap" itself into admissible evidence. *See United States v. Urbanik*, 801 F.2d 692, 697 (4th Cir.1986); *United States v. Chindawongse*, 771 F.2d 840, 844 (4th Cir.1985), *cert. denied*, 474 U.S. 1085, 106 S.Ct. 859, 88 L.Ed.2d 898 (1986). Whether that rule survives *Bourjaily*'s holding that the co-conspirator statement sought to be admitted may be considered in deciding whether a conspiracy existed is an open question in this circuit, *see United States v. Leavis*, 853 F.2d 215, 219 (4th Cir.1988), and we do not decide it here.

839 F.2d 1387, 1393 (10th Cir.), *cert. denied,* 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988); *United States v. Reyes,* 798 F.2d 380, 384 (10th Cir.1986); *United States v. Hamilton,* 689 F.2d 1262, 1270 (6th Cir.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 753, 754, 74 L.Ed.2d 971 (1983). Statements made by a co-conspirator to a third party who is not then a member of the conspiracy are considered to be "in furtherance" of the conspiracy if they are designed to induce that party either to join the conspiracy or to act in a way that will assist it in accomplishing its objectives, *see United States v. Mayberry,* 896 F.2d 1117, 1121–22 (8th Cir.1990); *United States v. Herrero,* 893 F.2d 1512, 1528 (7th Cir.), *cert. denied,* 496 U.S. 927, 110 S.Ct. 2623, 110 L.Ed.2d 644 (1990); *United States v. Monroe,* 866 F.2d 1357, 1363 (11th Cir. 1989); *United States v. Shoffner,* 826 F.2d 619, 628 (7th Cir.), *cert. denied sub nom. Stange v. United States,* 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987), but not if they were intended to be nothing more than idle chatter or casual conversation about past events, *see United States v. Doerr,* 886 F.2d 944, 951 (7th Cir.1989); *United States v. Posner,* 764 F.2d 1535, 1538 (11th Cir.1985); *United States v. Foster,* 711 F.2d 871, 880 (9th Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984); *United States v. Lieberman,* 637 F.2d 95, 102 (2d Cir.1980); *United States v. Eubanks,* 591 F.2d 513, 520–21 (9th Cir.1979); *United States v. Moore,* 522 F.2d 1068, 1077 (9th Cir.1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976). Whether a particular statement to a third party was intended to induce that party to join or assist the conspiracy, hence was "in furtherance" of it, must be determined by careful examination of the context in which it was made. *United States v. Perez,* 989 F.2d 1574, 1578–79 (10th Cir.1993); *United States v. McConnell,* 988 F.2d 530, 533–34 (5th Cir.1993); *Herrero,* 893 F.2d at 1528; *Mayberry,* 896 F.2d at 1121. *See generally* 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 801(d)(2)(E), at 801–318 to 801–323 (1992). A particular statement may be found to be "in furtherance" of the conspiracy even though it is "susceptible of alternative interpretations" and was not "exclusively, or even primarily, made to further the conspiracy," so long as there is "some reasonable basis" for concluding that it was designed to further the conspiracy. *Shoffner,* 826 F.2d at 628 (internal quotations omitted); *see Doerr,* 886 F.2d at 952.

In this case, the question whether the particular co-conspirator statements whose admission forms the basis for Shores' *Bruton* claim—Ellis' remarks to Rhodes that he and Shores had been involved in a "murder for hire" plot, that his role in the plot had been to pay Veselosky $5000 for killing Durham, and that he did in fact pay Veselosky the $5000 after Veselosky showed him pictures of an apparently dead Durham—can fairly be considered to have been made "in furtherance" of any then-existing conspiracy between Ellis and Shores is a close one. At first blush, these statements appear to be nothing more than casual conversation about past events, made by Ellis not to further the objectives of any conspiracy between himself and Shores—be it the original conspiracy to murder Durham or a later-formed conspiracy to obstruct justice in the criminal case arising out of that conspiracy—but simply to explain the charges he faced to his cellmate. But when the statements are considered in the context of everything else that Rhodes said Ellis told him, as they must necessarily be, *see supra* at 444, they can reasonably be construed as part of an attempt to induce Rhodes to join or provide assistance to the conspiracy. Rhodes testified that Ellis made these statements to him after he discovered that Rhodes was a long-time criminal who "had done a lot of fed[eral] time" and was connected with an organized crime group known as the "Dixie Mafia," and that he made them in the course of conversations in which he also sought Rhodes' advice on how he and Shores could fabricate a defense to the charges against them and asked him to help them find someone to kill Veselosky for them. On this record, the district court could reasonably have construed the particular statements in question as being designed, at least in part, to help induce Rhodes to join or provide assistance to the conspiracy, by providing him with necessary background and familiarizing him with the members of the conspiracy. *See Mayberry,* 896 F.2d at

1121–22; *Herrero,* 893 F.2d at 1528; *Monroe,* 866 F.2d at 1364; *Shoffner,* 826 F.2d at 628. We therefore conclude that the district court's finding that the statements were made "in furtherance" of the conspiracy cannot be termed clearly erroneous.

For the foregoing reasons, we conclude that the admission of the challenged statements did not violate Shores' Confrontation Clause rights, because those statements were admissible against him under the co-conspirator exception to the hearsay rule, and that the district court therefore did not abuse its discretion in denying his motion for severance under *Bruton.*[5]

### III.

Shores also argues that the district court committed reversible error in ordering the defense witnesses from Leavenworth to wear handcuffs in the courtroom; in refusing to tell Shores before he took the stand whether it would allow the government to cross-examine him on his prior record; in admitting a tape recording offered by the government; in refusing to allow certain rebuttal testimony from a defense witness; and in refusing to grant his motion for judgment of acquittal. We have carefully considered each of these arguments, but find them to be without merit.

*AFFIRMED.*

---

**5.** In light of this conclusion, we need not address the government's alternative arguments that there was no *Bruton* violation because the statements were admissible against Shores under the catch-all exception to the hearsay rule, or that any *Bruton* error was, in any event, harmless beyond a reasonable doubt.