48 F.3d 1218
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jerry RASH, Defendant-Appellant.
 No. 94-5049.
 United States Court of Appeals, Fourth Circuit.
 Argued: December 8, 1994.
Decided: March 10, 1995.
 
 ARGUED: Charles Randall Lowe, TATE, LOWE & ROWLETT, P.C., Abingdon, VA, for Appellant. Julie Marie Campbell, Assistant United States Attorney, Abingdon, VA, for Appellee. ON BRIEF: Robert P. Crouch, Jr., United States Attorney, Abingdon, VA, for Appellee.
 Before MURNAGHAN and MICHAEL, Circuit Judges, and CURRIE, United States District Judge for the District of South Carolina, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Jerry Rash was convicted for violating and conspiring to violate the Travel Act, 18 U.S.C. Sec. 1952(a)(3), by transporting others or causing others to travel in interstate commerce in furtherance of a prostitution business. He now appeals the district court's admission of certain evidence at trial and its application of the sentencing guidelines. Finding no error, we affirm.
 
 I.
 
 2
 Sharon and Jerry Rash are a married couple who until 1993 lived in Beckley, West Virginia. Between 1983 and approximately 1990, the Rashes ran a prostitution business that provided prostitutes to some customers of Abbs Valley Electric Company (AVE) of Bluefield, Virginia. The Rashes recruited women to act as prostitutes, made arrangements for the women to meet with various customers, and paid the women for their services. The Rashes received payment from Robert Painter, the owner of AVE.
 
 
 3
 The Rashes' prostitution ring was part of a larger racketeering operation involving AVE and officials from several coal companies that were AVE customers. Painter engaged in various schemes to divert business funds to personal use and to make payoffs to certain coal company officials to attract business. In return, the coal company officials sent AVE business and signed off on falsely inflated AVE invoices. Prostitutes supplied by the Rashes were among these payoffs.
 
 
 4
 On January 11, 1993, a grand jury issued a forty-three count indictment against the members of the AVE racketeering operation. The Rashes were charged with a single violation of the Travel Act, 18 U.S.C. Sec. 1952(a)(3).[1] The court granted the Rashes' motion to sever this count from the remainder of the indictment. On May 20, 1993, a grand jury returned a superseding indictment charging the Rashes with one count for conspiring to violate the Travel Act and two counts for individual violations of the Travel Act. Sharon Rash pled guilty, and Jerry Rash was tried.
 
 
 5
 At trial the government introduced, over Jerry Rash's objection, tape recordings of conversations between Sharon Rash, Jerry Rash, and Dixie Harvie, a government informant. In those tapes Sharon admitted that the Rashes had employed up to twelve or thirteen women as prostitutes and that those women had travelled to various locations in Virginia, West Virginia, and Kentucky to meet customers. On the basis of these tapes and testimony from coal company officials and several women who worked for the Rashes, Jerry was convicted on all counts.
 
 
 6
 At Jerry Rash's sentencing, the court applied U.S.S.G. Secs. 2E1.2 and 2G1.1, the guidelines governing, respectively, violations of the Travel Act and of the Mann Act.[2] Finding that at least four women had been transported interstate, the court applied Sec. 2G1.1 as though the transportation of each had been contained in a separate count. This involved the creation of two "pseudo counts" for sentencing purposes. The court then enhanced Jerry's base offense level by four levels for his role in the offense and by two levels for obstruction of justice, yielding a total offense level of 24. Jerry was sentenced to 51 months imprisonment.
 
 II.
 A.
 
 7
 Jerry Rash alleges several errors with respect to the admissibility and the sufficiency of the evidence. First, he contends that the court erred by admitting out-of-court statements of unspecified coconspirators without first determining that a conspiracy existed. Under Fed.R.Evid. 801, an out-of-court statement is not hearsay if it is made by a co-conspirator of the defendant in the course of and in furtherance of the conspiracy. To admit the statement of a coconspirator, a court must at some point find by a preponderance of evidence that a conspiracy existed. Bourjaily v. United States, 483 U.S. 171, 176 (1987). However, this finding need not be made before the statement is admitted, United States v. Blevins, 960 F.2d 1252, 1256 (4th Cir.1992), and the court can use the statement itself in determining whether a conspiracy exists. Bourjaily, 483 U.S. at 181.
 
 
 8
 Rash does not specify any particular statements--other than the taped conversations with Harvey, which we discuss below--that the court erred in admitting, nor does he provide any citations to the record. An appellant challenging the admissibility of particular evidence must refer to the pages of the appendix in which the evidence was admitted. Fed. R.App. P. 28(e). Rash's non-specific allegations of error provide an insufficient basis for meaningful review. See United States v. Isabel, 945 F.2d 1193, 1199 (1st Cir.1991) ("We cannot conduct effective appellate review of an evidentiary ruling admitting coconspirator statements ... absent reference to the challenged statements.").
 
 
 9
 We therefore confine our inquiry to the only statements Jerry Rash specifically challenges, which are the taped conversations between Sharon Rash, Jerry Rash, and Dixie Harvey. The government initially sought to introduce tapes of nine conversations between April and September, 1991, claiming that Sharon's statements were admissible against Jerry as statements of a co-conspirator. The court authorized the admission of four of these tapes, of which two, dated April 16 and April 22, 1991, were actually introduced. At the close of the government's case the court found that the evidence established the existence of a conspiracy which included both Jerry and Sharon Rash.
 
 
 10
 Nevertheless, Jerry contends that the statements were hearsay because they were made after the conspiracy ended in 1990, and they therefore were not made in the course of or in furtherance of the conspiracy.
 
 
 11
 Statements to a third party may "be 'in furtherance' of [a] conspiracy if they are designed to induce that party either to join the conspiracy or to act in a way that will assist it in accomplishing its objectives." United States v. Shores, 33 F.3d 438, 444 (4th Cir.1994). However, mere "idle chatter or casual conversation about past events" is not in furtherance of a conspiracy. Id. The court determined that in the conversations of April 16 and April 22, 1991, Sharon Rash had attempted to recruit Dixie Harvey as a prostitute, making the conversations in furtherance of the conspiracy. We must uphold this determination unless it is clearly erroneous. Bourjaily, 483 U.S. at 181.
 
 
 12
 We cannot say that the district court clearly erred in determining that these conversations were designed to induce Harvey to join the conspiracy. Sharon discussed with Harvey whether "options" were "still open" with the Rashes and mentioned people Harvey should talk to to make contacts. Jerry told Harvey that "the business is still out there" and described to Harvey what she needed to get started. These statements indicate that the Rashes were trying to recruit Harvey as a prostitute. Therefore, the court did not clearly err in determining that these conversations were in furtherance of the conspiracy.
 
 
 13
 Finally, Jerry Rash argues that, because Sharon Rash's statements were improperly admitted, the evidence was insufficient to sustain his conviction. As discussed above, Sharon Rash's statements were properly admitted. The evidence taken as a whole, including these statements, was clearly sufficient to support Jerry Rash's conviction. In addition to Sharon Rash's statements, government witnesses, including several prostitutes who had worked for the Rashes, testified to the existence of a conspiracy to promote prostitution. Sharon's statements and the testimony of other witnesses established that the Rashes and several prostitutes had travelled interstate in connection with this conspiracy. This evidence was sufficient to demonstrate violations of and conspiracy to violate the Travel Act.
 
 B.
 
 14
 Jerry Rash next alleges several errors at sentencing. First, he claims that the district court erred in sentencing him under U.S.S.G. Sec. 2G1.1, the guideline applicable to violations of the Mann Act. Rash alleges two separate errors. First, he claims that, because he was indicted under the Travel Act rather than the Mann Act, the district court should not have applied Sec. 2G1.1. Rather, the court should have applied Sec. 2E1.2, the guideline applicable to Travel Act violations. However, under Sec. 2E1.2(a)(2), the base offense level for a violation of the Travel Act is equal to the offense level applicable to the underlying crime in respect to which the travel was undertaken. In this case the underlying offense, promoting prostitution, was a violation of West Virginia and Virginia law. Because the underlying conduct violated state law, the district court was instructed by Application Note 2 to Sec. 2E1.2 to use the offense level corresponding to the most analogous federal offense. The district court correctly found that the most analogous federal statute was the Mann Act. Therefore, it properly sentenced Rash under Sec. 2G1.1, the guideline applicable to the Mann Act.
 
 
 15
 Second, Rash argues that even if Sec. 2G1.1 was the appropriate guideline, the court erred in constructing "pseudo counts" 4 and 5 for sentencing purposes. Section 2G1.1(c)(1) provides that if the "offense involved the transportation of more than one person," the defendant should be sentenced as "if the transportation of each person had been contained in a separate count." The court found that Jerry had transported or induced to be transported interstate at least four people. Because only two Travel Act violations had been alleged in the indictment, the court created two additional "pseudo counts" for sentencing purposes.
 
 
 16
 Rash urges that, because the court applied the guideline applicable to the Mann Act, it should have required the government to "prove each and every element required to be proved under the Mann Act" before adding each pseudo count. That is, he claims that before constructing each count, the court should have found that some woman (1) was transported interstate by the Rashes and (2) actually engaged in prostitution as a result.
 
 
 17
 Rash relies on United States v. Camuti, 950 F.2d 72 (1st Cir.1991), in which the court, sentencing the defendant for violation of the Mann Act, held that only actual transportation, and not inducement to travel, would yield a separate count under Sec. 2G1.1(c)(1). The present case, however, involves a violation of the Travel Act. The Mann Act explicitly distinguishes between actual transportation and inducement to travel. Compare 18 U.S.C. Sec. 2421 with Sec. 2422. The Travel Act draws no distinction between the two. Furthermore, the Travel Act requires only intent to promote illegal activity; it is irrelevant whether the illegal activity (i.e., prostitution) actually occurs. United States v. Pomponio, 511 F.2d 953, 957 (4th Cir.), cert. denied, 423 U.S. 874 (1975). Therefore, the district court was required to find only that Rash had induced a woman to travel interstate for the purpose of prostitution before constructing each pseudo count.
 
 
 18
 The evidence supports the court's finding that the Rashes induced at least four women to travel interstate. Sharon admitted in conversations with Dixie Harvey that up to twelve or thirteen women worked for her at various times, and she identified four of them--Donna Adkins, Brenda Pino, Connie Spencer, and Penny Breckenridge--by name. Sharon also said that she periodically went to Pikeville, Kentucky, and would take two or three women with her. Other witnesses testified that Brenda Pino travelled from West Virginia to Cumberland, Kentucky, and that several women travelled to Bluefield, Virginia, to meet customers. This evidence was sufficient to support the court's finding.[3]
 
 
 19
 Jerry Rash next challenges the district court's four point enhancement for his role in the offense under U.S.S.G. Sec. 3B1.1(a). Section 3B1.1 provides for a four point enhancement for an "organizer or leader of a criminal activity that involved five or more people or was otherwise extensive" and a two point enhancement for an organizer or leader of a criminal activity that was not extensive. In the presentence report, the probation officer recommended only a two point enhancement because (1) pursuant to the Application Notes to U.S.S.G. Sec. 2G1.1, the prostitutes themselves could not be considered participants unless they assisted in the transportation of others (and therefore the activity did not involve five or more people), and (2) the organization was not otherwise sufficiently extensive to warrant a four point increase.
 
 
 20
 The district court found that the organization was extensive, citing the following facts: (1) the operation lasted over seven years, (2) it involved as many as a dozen prostitutes, and (3) it implicated officials from numerous coal companies and other companies. Given these facts, the district court's determination was not clearly erroneous. All persons involved during the course of the entire offense must be considered in assessing whether an organization is extensive. U.S.S.G. Sec. 3B1.1, comment. (n.3); United States v. Ellis, 951 F.2d 580, 585 (4th Cir.1991), cert. denied, 112 S.Ct. 3030 (1992). Here, regardless of whether five or more persons actually violated the Travel Act, the large number of people involved in the Rashes' organization made that organization extensive.
 
 
 21
 Finally, Rash argues that the district court erred in enhancing his offense level by two points for obstruction of justice. At sentencing, IRS Agent Harrell Erwin testified that he interviewed the Rashes in September, 1991. He asked them whether they were involved in prostitution activities, and they replied that they were not. He then asked them whether they had purchased their 1985 Cadillac, and they answered that they had bought it themselves and made all of the payments. Erwin later discovered that the Cadillac had been purchased for the Rashes by Painter of AVE as a gift. Erwin testified that he spent an additional three or four months investigating because of the Rashes' false responses.
 
 
 22
 A materially false statement to a law enforcement officer is an obstruction of justice if it "significantly obstruct[s] or impede[s] the official investigation" of an offense. U.S.S.G. Sec. 3C1.1, comment. (n.3(g)). Rash argues that the three or four month delay Erwin described was due solely to Rash's denial of involvement with prostitution and not to his statement about the Cadillac. And the denial of involvement, Rash claims, is merely an "exculpatory no" which does not amount to obstruction of justice. See U.S.S.G. Sec. 3C1.1, comment. (n.1). While Erwin's testimony is not entirely clear in this respect, it could be read to support the court's finding that the delay was due to the Rashes' statements in response to both of the agent's inquiries, including Jerry Rash's statement about the Cadillac. Therefore, the court did not clearly err in granting an enhancement for obstruction of justice.
 
 III.
 
 23
 For the foregoing reasons, we affirm Jerry Rash's conviction and sentence.
 
 AFFIRMED
 
 
 [1]
 The Travel Act makes it a crime when a person travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to ... promote, manage, establish, carry on, or facilitate the promotion, management, or carrying on, of any unlawful activity
 18 U.S.C. Sec. 1952(a). "Unlawful activity" includes "prostitution offenses in violation of the laws of the State in which they are committed." 18 U.S.C. Sec. 1952(b). Aiding, transporting, or procuring a prostitute is illegal under W. Va.Code Sec. 61-8-5(b) and Va.Code Ann. Sec. 18.2-348.
 
 
 [2]
 The Mann Act, 18 U.S.C. # 8E8E # 2421, 2422, prohibits transportation of a woman in interstate commerce for the purpose of prostitution
 
 
 [3]
 We have already decided exactly this issue against Sharon Rash. See United States v. Sharon Rash, No. 94-5050, 1994 WL 507374 (4th Cir. Sept. 19, 1994)