**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――――

**No. 13-4457**

―――――――――――

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RAYMOND COLLINS,

Defendant - Appellant.

―――――――――――

**No. 13-4458**

―――――――――――

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

EDWARD WILSON,

Defendant - Appellant.

―――――――――――

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:12-cr-00502-CMH-1; 1:12-cr-00502-CMH-2)

―――――――――――

Argued: March 19, 2014               Decided: July 1, 2014

―――――――――――

Before TRAXLER, Chief Judge, and WILKINSON and KEENAN, Circuit Judges.

―――――――――――

Affirmed by unpublished per curiam opinion.

———————————

**ARGUED**: Joan Caroline Robin, LAW OFFICE OF JONI C. ROBIN PLLC, Alexandria, Virginia; Christopher Robert Kennedy Leibig, LAW OFFICE OF CHRISTOPHER LEIBIG LLC, Alexandria, Virginia, for Appellants. Michael Phillip Ben'Ary, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF**: Dana J. Boente, Acting United States Attorney, Maya D. Song, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellants Raymond Collins and Edward Wilson raise numerous challenges to their convictions for conspiracy to distribute five kilograms or more of cocaine and 280 grams or more of crack, in violation of 21 U.S.C. §§ 841 and 846. We reject each of these challenges and affirm the convictions for both Collins and Wilson.

## I.

From 2009 to 2012, Collins and Wilson were involved in the sale and distribution of illegal drugs in the Houston, Texas, area. Houston-based dealer Christopher Buckner described Collins and Wilson as business partners in the drug trade who were like brothers. Buckner's supplier was Collins, who was able to obtain and sell large amounts of cocaine—as much as two kilograms every two days. To facilitate their distribution operation, Collins and Wilson both had vehicles—Collins a red pickup truck and Wilson a blue Acura SUV—equipped with hidden compartments near the console to store drugs, money or handguns, preventing easy detection.

In 2010, agents employed by the Drug Enforcement Agency ("DEA") in northern Virginia were investigating a Virginia dealer named Stevie Thornton, who had relocated to Houston but still sought to sell to customers in Virginia. Using an informant, the DEA set up drug buys from Thornton in Houston and

conducted surveillance during each of these transactions. Collins supplied the cocaine to Thornton in two of these deals. On April 12, 2011, Thornton agreed to sell the Virginia-based informant four ounces of cocaine that Buckner, in turn, arranged to buy from Collins. Buckner and Thornton arrived at the prearranged transaction site, the Taco Cabana restaurant parking lot, and contacted Collins via Buckner's cell phone. Collins, however, informed Buckner that he could not make the meeting and was sending Wilson to deliver the cocaine. Subsequently, Wilson arrived at the Taco Cabana in a blue Acura SUV. Buckner paid Wilson for the cocaine and Wilson gave him the four ounces. Cell phone records corroborate that Buckner and Collins were in frequent contact before the deal, and that Collins and Wilson were in frequent contact before the meeting. Law enforcement surveillance photos were taken of Buckner and Thornton as well as Wilson's blue Acura SUV during the Taco Cabana meeting. Later, Buckner discussed with Collins the fact that he overpaid Wilson for the cocaine.

Thornton arranged to have Buckner broker another deal for the Virginia informant, this time for a half-kilogram of cocaine supplied by Collins. On June 8, 2011, Buckner and Thornton rode in Thornton's tow truck to meet Collins, who was driving his red pick-up truck. Before the exchange took place, Buckner became suspicious that they were being watched by law enforcement, so

4

Buckner called Collins and aborted the transaction. Law enforcement agents conducting surveillance arrested Thornton and Buckner in Thornton's tow truck as they were leaving.

On March 26, 2012, Collins was arrested while driving Wilson's Acura SUV after Houston law enforcement agents conducting surveillance of a residence observed a blue Acura SUV arrive. Agents followed Collins to a nearby Wal-Mart parking lot, where they observed him engage in a transaction with the driver of a Nissan Altima. Around 9 p.m., shortly after leaving the Wal-Mart, Collins was stopped by Houston police officer Le. Officer Le then told narcotics officers involved in the surveillance that Collins had consented to a search of the Acura SUV. With the assistance of a K-9 unit, officers found cocaine, approximately $35,000 in cash, and a .45 caliber handgun in a hidden compartment near the console in the Acura.

Appellants were both charged with conspiracy to distribute five kilograms or more of cocaine and 280 grams or more of crack (count 1), and Collins alone was charged with possession of a firearm in furtherance of a drug trafficking crime (count 2). Prior to trial, Collins moved to suppress the evidence from the search of the Acura SUV. The district court, based largely on hearsay testimony from narcotics agents at the suppression hearing, found that Collins had consented to the search and denied the motion.

5

The jury found Appellants guilty as charged. On the conspiracy count, the jury found that Collins and Wilson conspired to distribute at least five kilograms of cocaine and at least 28 grams, but less than 280 grams, of crack. Appellants both received 240 months' imprisonment for the drug conspiracy offense, and Collins received an additional consecutive 60-month term for his firearm charge.

## II.

### a.

Appellants first argue that the trial court abused its discretion by refusing Appellants' request that prospective jurors be questioned during voir dire about their ability to apply the burden of proof and reasonable-doubt standards. Appellants contend this specific line of inquiry was necessary in light of their defense at trial that while the evidence might prove drug activity in Texas, the Appellants nevertheless did not join the conspiracy as charged by the government. They proposed these voir dire questions on the basis that reasonable jurors might naturally be reluctant to return apparent drug dealers to the streets despite no evidence supporting the charged offense. The district court declined, stating that it would "properly instruct the jury in those areas." J.A. 358. The court then asked typical voir dire questions relating to whether any prospective juror had any prior knowledge of the

6

facts of or the participants in the case, worked in or was related to anyone working in law enforcement, or had any experience as a victim, witness or defendant in a criminal proceeding. The district court subsequently instructed the jury as to the government's burden of proving the charged crimes beyond a reasonable doubt, and Appellants do not take issue with this aspect of the charge.

Appellants' argument is foreclosed by circuit precedent. In United States v. Jeffery, 631 F.3d 669, 674 (4th Cir. 2011), we held that a district court is not required to ask questions in voir dire relating to the reasonable-doubt standard and burden-of-proof issues when requested by the defendant so long as the jury is properly instructed at the end of trial. In Jeffery, as here, the accused submitted voir dire questions "address[ing] the jurors' willingness to apply the reasonable-doubt standard and to hold the government to its burden of proof," but the district court declined to ask any questions specifically addressing the reasonable-doubt standard and instead asked "fairly standard questions, such as whether the potential jurors knew about the facts of the case, or whether they or their family worked in law enforcement." Id. at 672. No one contends that the district court failed to properly instruct on the reasonable-doubt standard or the government's burden of proof; we see no cogent basis for concluding that this

7

case falls outside the scope of our settled general rule that the district court is not required to question prospective jurors about reasonable-doubt or burden-of-proof issues during voir dire.

b.

Second, Appellants contend that the district court abused its discretion by denying their motion to argue the law to the jury and that the jury, in turn, be allowed to determine the applicable law according to its own collective conscience. Appellants expressly acknowledge that Sparf v. United States, 156 U.S. 51 (1895), forecloses the argument that the jury may independently determine the applicable law. "Public and private safety alike would be in peril if the principle be established that juries in criminal cases may, of right, disregard the law as expounded to them by the court, and become a law unto themselves." Id. at 101. As we have explained, Sparf "affirmed the right and duty of the judge to instruct on the law, and since that case the issue has been settled." United States v. Moylan, 417 F.2d 1002, 1006 (4th Cir. 1969); see id. at 1007 ("Since the Sparf case, the lower federal courts-even in the occasional cases in which they may have ventured to question its wisdom-have adhered to the doctrine it affirmed." (footnote omitted)). We continued to embrace this principle in United States v. Muse, 83 F.3d 672, 677 (4th Cir. 1996), explaining

8

that "a defendant is not entitled to inform the jury that it can acquit him on grounds other than the facts in evidence." Indeed, although "a jury has the power of nullification[,] . . . defense counsel is not entitled to urge the jury to exercise this power." Id. Nevertheless, Appellants ask us to "revisit" Sparf as if a Fourth Circuit panel could overturn Supreme Court precedent. As counsel should well know, a panel of this court does not even have the power to overturn the decisions of previous panels of our own court, see United States v. Guglielmi, 819 F.2d 451, 457 (4th Cir. 1987) (holding that only the en banc court, not a subsequent panel, has the authority to overturn a previous panel's published decision), let alone Supreme Court authority. Accordingly, we reject this argument.

c.

Collins challenges the district court's denial of his motion to suppress evidence recovered from a search of his vehicle. In considering the denial of a motion to suppress, we review a district court's legal conclusions de novo and its factual findings for clear error. See United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008). We also construe the evidence in the light most favorable to the prevailing party, i.e., the government. See id.

At the pretrial suppression hearing, the evidence demonstrated the following. On March 26, 2012, Houston-area

9

narcotics officer Ben Katrib, acting on information from a confidential informant, was conducting surveillance on the driver of a blue Acura SUV believed to possess one kilogram of cocaine. Officer Katrib solicited help from DEA agents Matthew Buchert and Terrence Bryant and advised Deputy James Thomas, the K-9 handler, that his help might be needed as well. Around 9 p.m., the blue Acura SUV was observed leaving a residence and arriving at a nearby Wal-Mart, where the driver of the SUV conducted a brief transaction with the female driver of a Nissan Altima. Following the transaction, Officer Katrib directed that the law enforcement agents split up and follow both vehicles. The Nissan was followed, stopped and searched by Officers Thomas, Buchert and Katrib; the search of the vehicle and its driver yielded cocaine powder and marijuana.

Agent Bryant followed the SUV from the Wal-Mart parking lot and observed the driver of the SUV commit various traffic violations, including failing to come to a complete stop at a stop sign and failing to use a turn signal. Agent Bryant, who was driving an unmarked car, enlisted the help of a Houston police officer, Officer Le, who was on patrol in the area. Officer Le conducted a traffic stop of the Acura SUV, which was being driven by Collins. Agent Bryant observed Officer Le approach the SUV to obtain standard information such as a driver's license and insurance information and then return to

10

his cruiser. After Officer Le returned to the SUV, Agent Bryant saw Collins exit the vehicle and sit down on the curb "very calm[ly]." J.A. 133. Agent Bryant testified that, at that point, "Officer Le told me that the defendant had given consent to search the vehicle." J.A. 132. Agent Bryant, however, was not privy to any discussion between Officer Le and Collins. Officer Le did not testify at the suppression hearing.

Agent Bryant notified Officers Katrib and Thomas that the SUV had been stopped, and he began searching the vehicle while the K-9 unit was in route. When Officer Katrib arrived, he was advised by officers on the scene that Collins "had granted verbal consent for the search of the vehicle." J.A. 157.

Agent Bryant's initial search of the SUV did not uncover any contraband. When the K-9 unit arrived 10 to 15 minutes later, however, the drug dog alerted to the front console, where officers located a hidden compartment containing a loaded .45-caliber semi-automatic handgun and approximately 85 grams of cocaine. Approximately $35,000 was recovered from the Acura SUV and Collins' person.

There is no indication that Collins was handcuffed during the search. According to Officer Katrib, Collins appeared to be relaxed and confident and even wore a "smirk" during the search. At no time did Officer Katrib hear or see anything indicating that Collins wanted to withdraw his consent to the search.

11

The district court concluded that the stop of the Acura SUV being driven by Collins was lawful and that Collins then consented to the search of the vehicle. Thus, the court denied the motion to suppress. On appeal, Collins contends that the government failed to present any evidence that he voluntarily consented to the vehicle search.

The Fourth Amendment generally prohibits warrantless searches, but the warrant requirement does not apply where valid consent to the search is given. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). "[T]he Government bears the burden of establishing, by a preponderance of the evidence, that it obtained valid consent to search." United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007). Of course, consent is valid only when it is freely and voluntarily given. See Trulock v. Freeh, 275 F.3d 391, 401 (4th Cir. 2001). "[V]oluntariness of consent to search is a factual question, and as a reviewing court, we must affirm the determination of the district court unless its finding is clearly erroneous." United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996) (en banc).

The government relied on hearsay testimony from Agent Bryant and Officer Katrib to establish that Collins consented to the search. It is well established, however, that hearsay testimony is admissible at a suppression hearing. See United States v. Matlock, 415 U.S. 164, 172-75 (1974) (reversing

12

district court's refusal to admit hearsay at suppression hearing); United States v, Raddatz, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."). When the evidence presented at the suppression hearing is viewed in the light most favorable to the government, the totality of the circumstances support the court's conclusion that the government obtained valid consent to search the SUV. Nothing in the record suggests coercive circumstances when Collins consented to the search. In fact, the opposite is true. Collins appeared to be calm and even confident to the point that he was smirking at officers who were having difficulty locating the evidence hidden in the secret compartment. No weapons were drawn and Collins was not cuffed during the search. We perceive no clear error in the district court's factual determination that Collins consented to the search of the vehicle. Accordingly, we affirm the district court's denial of Collins' motion to suppress.

d.

Wilson challenges the sufficiency of the evidence to support his conviction for conspiracy to distribute five kilograms or more of cocaine and 28 grams or more of crack. The verdict of the jury "must be sustained if there is substantial evidence, taking the view most favorable to the Government, to

13

support it." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (emphasis and internal quotation marks omitted). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Green, 599 F.3d 360, 367 (4th Cir. 2010) (internal quotation marks omitted).

In order to prove conspiracy to distribute cocaine and cocaine base, the government must show: "(1) an agreement to distribute . . . cocaine [and cocaine base] . . . existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of th[e] conspiracy." United States v. Yearwood, 518 F.3d 220, 225-26 (4th Cir. 2008) (internal quotation marks omitted). "Proof of a conspiracy may of course be by circumstantial evidence; it need not and normally will not be by direct evidence." United States v. Mabry, 953 F.2d 127, 130 (4th Cir. 1991) (internal quotation marks omitted). "Once it has been shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." United States v. Brooks, 957 F.2d 1138, 1147 (4th Cir. 1992).

Viewed in the light most favorable to the government, the evidence supports the conclusion that Wilson and Collins were

14

partners in the drug distribution trade together. Co-conspirator Buckner described Collins and Wilson as being like "business partners" and "brothers." J.A. 456. From 2009 to 2011, Collins supplied Buckner with cocaine that Buckner then redistributed. Collins and Wilson's enterprise moved a high volume of drugs; Buckner estimated that Collins was moving two kilos of cocaine every two days. While Buckner generally dealt with Collins, he purchased a small amount of cocaine—a half ounce—from Wilson on at least one occasion. And in April 2011, Buckner arranged to purchase four ounces of cocaine from Collins for an acquaintance from Virginia. Shortly before the transaction was to occur, however, Collins told Buckner that he could not meet with Buckner. Instead, Collins sent Wilson in his place to meet with Buckner. Wilson arrived at the Taco Cabana driving a blue Acura SUV with the cocaine; Buckner entered the SUV and paid for the cocaine. Moreover, Buckner's account of this transaction was corroborated by S.D. Thornton who bought drugs from Buckner on multiple occasions. Officer Brian Gavin, who took surveillance photographs, further corroborated the general details of the Taco Cabana transaction.

Wilson's Acura SUV was fitted with an after-market secret compartment behind his console, a feature that was popular among drug traffickers. Buckner testified that Collins owned a red

15

truck that also had a hidden compartment in which he stored drugs and a handgun.

Wilson contends that, apart from the Taco Cabana sale, there is no indication that Wilson engaged in repeated or routine drug deals or otherwise did anything to join the conspiracy. The evidence connecting Wilson to the conspiracy, however, is strong enough to support the jury's guilty verdict. There was testimony that Wilson and Collins were like brothers in their drug distribution business. More importantly, Collins sent Wilson in his stead to complete the Taco Cabana transaction. These facts alone are sufficient to connect Wilson to the conspiracy.[*]

e.

Next, Appellants seek reversal on the basis that the district court refused to afford the jury a written copy of the

---

[*] Wilson also argues that in the event we agree that the evidence was insufficient to convict him, we should then conclude that the district court erred in calculating drug quantity under the guidelines. Specifically, Wilson argues that the district court offered no explanation to support the determination that he be held accountable for over 150 kilograms of cocaine. As explained above, however, the evidence was sufficient to support his conviction. The presentence investigation report (PSR) calculated the amounts based on the same evidence supporting Wilson's conviction and found that Wilson and Collins, who "were equal partners in the distribution of illicit drugs," were "responsible for [446 kilograms] of powder cocaine." J.A. 811. The district court specifically found that the drug quantities were "properly calculated by the probation officer." J.A. 781.

16

jury instructions. The decision to provide a set of written instructions to the jury is clearly one that is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. See United States v. Jones, 353 F.3d 816, 818 & n.2 (9th Cir. 2003) (collecting cases). Appellants fail to identify any reason requiring the district court to supply a written copy of the instructions to the jury. The trial was less than two days long and the jury was presented with a very limited number of witnesses to consider and issues to decide. Presuming, as we must, "that a properly instructed jury has acted in a manner consistent with the instructions," United States v. Alerre, 430 F.3d 681, 692 (4th Cir. 2005), there was no reason in this case to believe the jury could not follow the court's oral instructions under the circumstances.

Appellants respond that the jury expressed confusion and asked to be reinstructed on the issue of drug weight and the concept of multiple conspiracies. After deliberation began, the jury sent the following note to the court: "The quantity of cocaine and cocaine base – do they relate to Virginia only or anywhere?" J.A. 648. The note was silent with respect to the issue of multiple conspiracies – it related to calculating drug quantity. And, significantly, the issue raised in the jury note was not addressed in the court's instructions. Thus, giving those instructions to the jury in written form would not have

17

shed light on the jury's question. We conclude that the district court was well within its discretion in declining to give the jury a written copy of the jury instructions.

f.

Next, Wilson contends that the district court erred in rejecting his proposed jury instructions regarding the drug quantity attributable to him. Reviewing the refusal to give a jury instruction for abuse of discretion, we will reverse only when the requested instruction "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." United States v. Lighty, 616 F.3d 321, 366 (4th Cir. 2010) (internal quotation marks omitted). "[This Court] review[s] a jury instruction to determine whether, taken as a whole, the instruction fairly states the controlling law." United States v. Hurwitz, 459 F.3d 463, 474 (4th Cir. 2006) (internal quotation marks omitted).

Wilson asked the court to instruct the jury (1) that it must "make an individualized determination of the quantity of drugs attributable to each defendant," J.A. 301, and (2) that the jury must "bear in mind that guilt is individual" and that the jury's "verdict as to each defendant must be determined separately with respect to him." J.A. 287. The district court

18

instead adopted the government's proposed language and instructed the jury that "the defendants are accountable for the quantity of controlled substances that they personally distributed or that they could reasonably foresee that others would distribute." J.A. 638.

The district court's instruction correctly stated the law as to the drug quantity attributable to an individual defendant in a drug conspiracy case. In United States v. Collins, 415 F.3d 304, 312 (4th Cir. 2005), we explained that

> the sentencing provisions applicable to conspiracies involving multiple narcotics should be individualized to reflect a particular coconspirator's relative culpability in the conspiracy . . . [and a district court must] assess the quantity of narcotics attributable to each coconspirator by relying on the principles set forth in [Pinkerton v. United States, 328 U.S. 640 (1946)].

Id. (internal quotation marks omitted). Under Pinkerton, a defendant is liable not only for the amount of drugs that he was personally involved in distributing, but also for those amounts distributed by other members of the conspiracy whose actions were both "reasonably foreseeable and in furtherance of the conspiracy." United States v. Blackman, 746 F.3d 137, 141 (4th Cir. 2014). As required by Collins, the district court properly instructed the jury on the Pinkerton principles. See Collins, 415 F.3d at 314.

19

Nonetheless, Wilson argues that the district court's instructions constituted reversible error because, when coupled with the court's instruction that "a person who knowingly, voluntarily, and intentionally joins an existing conspiracy is responsible for all of the conduct of the coconspirators from the beginning of the conspiracy," J.A. 637-38, the court's instruction misled the jury into grouping Appellants together when determining the drug quantity attributable to Wilson alone. We disagree. To the extent the jury instructions permitted any confusion as to the individualized assessment of the quantity of drugs connected to each defendant, the district court's separate verdict forms reiterated the jury's duty to separately determine whether each defendant was guilty of conspiracy. The special verdict forms required the jury to determine separately whether each individual defendant was guilty of conspiring to distribute cocaine and cocaine base and, if so, the amount attributable to each individual defendant. Accordingly, Wilson's proposed jury instructions were substantially covered by the district court's instructions.

g.

Finally, Appellant Wilson argues that the district court abused its discretion by admitting into evidence a recorded jail phone call between himself and Collins offered by the government to show that Collins and Wilson were trying to "get on the same

20

page with respect to the Taco Cabana [drug] deal," J.A. 540, so as to "further[] . . . the conspiracy" by "concealing" it," J.A. 539. The call, as transcribed, proceeded as follows:

> Collins: "Another thing that might gotta come, you know, we gotta see how we gonna put this in order is about that, . . . whatever they talking about happened at the Taco Cabana. We gotta . . . to the lawyers rather, we gotta confirm it or not confirm it, you know, and [the lawyers] got to work [their] way around that some type of way and I don't wanna just say . . . then, you know, there's no way they can reform that . . . You know what I'm saying. . . .

> Wilson: Man . . . [unintelligible]

> Collins: . . . they're not gonna go in there and say "yeah", it happened, you know what I'm saying, but I ain[']t . . .

> Wilson: [S]he's working on that shit right now, but ain[']t no need to be reformed dog, the shit is bullshit.

> Collins: It can be bullshit bro, but it's to the point about how much the FBI got about that shit and how . . . you know what I'm saying. And if we just straight up say, you know what I'm saying I can't really get at you but I wanna get a confirmation with you if we on the same page before I take it there.

J.A. 716 (some internal alterations in original).

Wilson objects to the introduction of the statements by his co-defendant Collins on two grounds. First, Wilson argues that the admission of the phone call violated his rights under the Confrontation Clause. We disagree. The Confrontation Clause reaches only "testimonial" statements. See United States v. Jones, 716 F.3d 851, 855 (4th Cir. 2013) (internal quotation marks omitted). Statements are testimonial when "a reasonable

21

person in the declarant's position would have expected his statements to be used at trial – that is, [when] the declarant would have expected or intended to bear witness against another in a later proceeding." Id. (internal quotation marks omitted). Recorded phone calls from prison clearly are not "testimonial" per se. See id. (holding that statements made in "casual conversations" on prison telephone calls were not testimonial and their admission did not violate Confrontation Clause). We agree with the government that nothing indicates Collins expected or intended to "bear witness" against Wilson in the phone call, as Collins' statements implicated himself as much as Wilson to the extent that they implicated anyone at all.

Second, Wilson argues that Collins' statements constituted inadmissible hearsay that was not subject to the co-conspirator exception to the hearsay rule under Rule 801(d)(2)(E) of the Federal Rules of Evidence. Under this rule, "a statement of the defendant's co-conspirator is admissible against the defendant if it was made during the course of and in furtherance of the conspiracy." United States v. Shores, 33 F.3d 438, 442 (4th Cir. 1994) (internal quotation marks omitted). A co-conspirator's statements come in "if the court finds (i) that the defendant and the declarant were involved in a conspiracy with each other at the time the statement was made; and (ii) that the statement was made in furtherance of that conspiracy."

22

Id. (footnote omitted); see Krulewitch v. United States, 336 U.S. 440, 442 (1949) (holding that an out-of-court statement of one conspirator may be admitted against his fellow conspirator only if the statements were "made pursuant to and in furtherance of objectives of the conspiracy charged").

Wilson argues that the drug conspiracy was over when the statement was made as both Appellants were incarcerated. The government argues that although the statement was made as part of a separate conspiracy to obstruct justice at the trial, it was nonetheless related to the charged conspiracy. Even if these statements were not made in furtherance of the conspiracy as required by Rule 801(d)(2)(E), we conclude that the admission of the phone call was harmless. See United States v. Graham, 711 F.3d 445, 453 (4th Cir. 2013) ("The incorrect admission of a statement under the coconspirator statement exclusion from the definition of hearsay is subject to harmless error review."). "Erroneously admitted evidence is harmless if a reviewing court is able to say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." United States v. Johnson, 587 F.3d 625, 637 (4th Cir. 2009) (internal quotation marks omitted). As Wilson points out, he uttered only a single sentence during the phone call which could be taken to suggest that Wilson disagreed that he and Collins

23

needed to get "on the same page" and "reform" the facts. J.A. 716. In fact, to the extent Wilson's statement was even intelligible, a juror could reasonably conclude that Wilson was denying involvement in the Taco Cabana incident which he referred to as "bull***t" and that Wilson felt "no need to . . . reform[]" the facts before trial. J.A. 716. We conclude that the jury's verdict in this case could not reasonably have been swayed by the admission of the largely incomprehensible phone conversation between Wilson and Collins.

## III.

For the foregoing reasons, the judgment below is hereby

AFFIRMED.

24