COURT OF APPEALS OF VIRGINIA

Present:   Judges Alston, McCullough and Senior Judge Clements
Argued at Richmond, Virginia


ANDREW STEVE BARRETT

MEMORANDUM OPINION* BY
v.       Record No. 1741-14-2       JUDGE JEAN HARRISON CLEMENTS
OCTOBER 6, 2015

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Samuel E. Campbell, Judge Designate

Brent A. Jackson (Brent A. Jackson & Associates, P.C., on brief), for
appellant.

Susan Baumgartner, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


Appellant contends the trial court erred in denying his motion to suppress because the

police stopped his vehicle without a reasonable, articulable suspicion of criminal wrongdoing.

He also asserts the trial court erred by reconsidering and reversing its original ruling excluding

the testimony of Detective Partin.  We disagree, and affirm.

## Background

"In reviewing a trial court's denial of a motion to suppress, '[t]he burden is upon [the

defendant] to show that th[e] ruling, when the evidence is considered most favorably to the

Commonwealth, constituted reversible error.'"  McGee v. Commonwealth, 25 Va. App. 193,

197, 487 S.E.2d 259, 261 (1997) (en banc) (quoting Fore v. Commonwealth, 220 Va. 1007,

1010, 265 S.E.2d 729, 731 (1980)).  While we are bound to review de novo the ultimate

questions of reasonable suspicion and probable cause, we "review findings of historical fact only

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

for clear error[1] and . . . give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690, 699 (1996) (footnote added). Narcotics Detective Joseph Partin received information from a confidential informant that appellant had sold the informant twenty to forty pounds of marijuana each month for the past year and that appellant's supply originated from out of state. Partin had worked with the informant for approximately six months and, based on the information he provided, had arrested six or seven individuals for drug trafficking. In some instances, the informant had participated in the surveillance and reported to Partin how much marijuana he observed. With respect to appellant, the informant advised Partin he drove a gold Explorer and usually met the informant in the Hull Street/Chippenham area.

Based on the confidential informant's tip, Partin and Detective Thomas Kline undertook surveillance on appellant. On April 24, 2012, appellant met with Everton Kerr, a marijuana trafficker, in a market parking lot. The two men interacted only a couple of minutes. Appellant handed Kerr a "significant wad of cash" before both men left in their respective vehicles.[2]

On April 27, 2012, Partin and Kline followed appellant to a business parking lot. Appellant exited his vehicle and approached Javin Bynoe, who had driven to the parking lot in a silver Nissan. Bynoe, a known marijuana dealer, counted an "inch thick" wad of cash, and the two men talked briefly before appellant returned to his Ford Explorer. Appellant drove to the back of Bynoe's car, and Bynoe got out of the car and handed a plastic bag to appellant through

---

[1] "In Virginia, questions of fact are binding on appeal unless 'plainly wrong.'" McGee, 25 Va. App. at 198 n.1, 487 S.E.2d at 261 n.1 (quoting Quantum Div. Co. v. Luckett, 242 Va. 159, 161, 409 S.E.2d 121, 122 (1991)).

[2] At trial, Partin testified that, in his opinion as an expert in drug distribution, appellant's payment to Kerr was "consistent with a drug payback." Partin explained that such a situation occurred when one individual "fronted" drugs to another individual with the expectation of receiving payment later.

the passenger window.  Appellant in turn handed a plastic bag to Bynoe.  Bynoe opened the trunk of his car and tossed the bag inside.

On May 4, 2012, Partin continued his surveillance of appellant and followed him to the Oriental Food Market, a location known to Partin as a site for drug distribution.  Appellant parked next to the market and walked to the back of the store.  After looking around, he returned to his car.  Within ten minutes an individual[3] drove up to the market.  The individual handed appellant a plastic baggie approximately four inches wide and eight inches deep.  After the handoff, appellant and the individual left the market.

On May 14, 2012, Partin followed appellant to an apartment complex.  After appellant made a phone call, a black male approached appellant's car and entered the passenger side.  Partin watched as appellant counted money.  Approximately five minutes after meeting appellant, the black male exited the car with a red "cinch top" bag and walked back to the apartments.  Appellant drove away.

The following day, on May 15, 2012, Partin set up surveillance near Bynoe's residence in anticipation of appellant's arrival.  When appellant arrived, he looked around briefly and waited for a car to pass before retrieving a bag from the rear of his car.  He entered Bynoe's house with the bag, but when he left, he was no longer carrying it.

Upon leaving Bynoe's home, appellant immediately drove to the Richmond airport and parked in the cell phone lot.  He remained in the cell phone lot for several minutes before driving to the passenger pickup zone and stopping at the curb.  Appellant exited his vehicle and entered the airport.  Partin followed appellant inside.

---

[3] At the time Partin saw the individual, he could not identify him; the individual was later identified as Paul Burton.

Appellant paced back and forth and looked at the flight information screens before returning to his car and checking his cell phone. Moments later, appellant walked back into the airport and retrieved a suitcase from the baggage claim conveyor belt. The suitcase had a "very large" red bow on top of it. Instead of exiting the airport doors closest to his vehicle, appellant walked to the exit farthest away from his vehicle and wheeled the suitcase outside. He left the suitcase on the sidewalk and walked across the street.

He stood across the street and watched the bag briefly before returning to the sidewalk area where he had left the bag. Instead of retrieving the bag, he walked down the sidewalk toward his car and sat on a bench. He watched the bag for approximately thirty seconds before getting up and walking back to his car. He started his car, drove up to the bag, and placed it in the back of his car before driving away.

On May 16, 2012, appellant drove to the airport again. As he had on the previous day, he parked briefly in the cell phone lot before parking at the curb in the arrival area. When he entered the airport, he met a black woman and gave her a hug. The woman had two suitcases similar in appearance to the one appellant had retrieved the prior day. Appellant picked up the two bags, and walked with the woman to his car. He put the bags in the back of his car and drove away with the woman in the passenger seat. Partin followed them to a motel in Chesterfield County. The woman got out of appellant's car and entered the motel without the suitcases. Appellant left the motel and drove back home.

On May 18, 2012, appellant left his home with a "full" plastic baggie and drove to Bynoe's residence. The bag resembled the bag appellant had taken inside Bynoe's house a few days earlier. Once again, appellant entered Bynoe's house with the bag, but no longer had it with him upon leaving.

On May 21, 2012, Kline and Partin followed appellant to Paul Burton's apartment. Burton was under investigation for drug distribution. When appellant left Burton's apartment, appellant was holding a plastic bag. As appellant and Burton stood outside the apartment, Kline got out of his vehicle and walked past them. The bag in appellant's hand was a gray, transparent grocery bag. As Kline walked past, he could see a "wad" of cash inside the bag.[4] The door was partially open to the apartment near where appellant and Burton were standing. Kline smelled a strong odor of marijuana emanating from the apartment. Appellant left the apartment complex, but met Burton again on May 22, 2012.[5] The two men followed each other in separate cars before pulling over and parking briefly. Appellant got out of his car and sat in Burton's car for approximately one minute before both men drove away.

The following day, on May 23, 2012, appellant returned to the Chesterfield motel where he had previously dropped off the black female. He picked up a black female from the motel[6] and drove her to the Richmond airport. She exited appellant's car without any luggage. Partin followed her inside and watched her board an airplane without any luggage.

On May 25, 2012, Partin continued his surveillance of appellant. That morning, appellant rented a car and met a black male driving a maroon SUV. Appellant chatted with the black male, counted money, and placed the money inside the rental vehicle.

---

[4] At the suppression hearing, Kline was qualified as and testified as an expert in narcotics distribution. Kline opined that, when money is passed in a plastic bag to an individual, and the individual passes another item back in a plastic bag, the transaction "typically" involved the exchange of narcotics or illegal goods.

[5] While Partin recited the date of this second meeting as May 27, 2012, his testimony also suggests it occurred on May 22, 2012. Based upon his chronological description of the surveillance, we assume that he intended to state that appellant's second meeting with Burton occurred on May 22, 2012.

[6] Partin was unable to state whether the woman was the same woman appellant had originally met at the airport.

By this time, Partin had observed appellant's activities for forty of the last forty-six days. He concluded appellant's activities were consistent with drug distribution.

On June 4, 2012, appellant returned to the Richmond airport. Once again, he parked in the cell phone lot before ultimately driving to the passenger pickup area. After using his cell phone, appellant went inside the airport and met a black female. The female removed two suitcases from the baggage carousel and greeted appellant. Appellant picked up the bags and walked with the woman to his car. After placing the bags in his car, appellant left the airport with the woman.

Partin dispatched members of his narcotics team to the Chesterfield motel appellant had previously visited, as well as to appellant's house. Appellant drove straight to the motel from the airport. After appellant dropped off the woman and drove away with the suitcases, Deputy Polk stopped him. As Partin had already requested a drug dog, a canine unit arrived at the scene two minutes later.

When the drug dog alerted, the police searched appellant's vehicle and recovered a large quantity of marijuana. Appellant was arrested.

Appellant moved to suppress the results of the search on the basis that the stop was not supported by a reasonable, articulable suspicion of criminal wrongdoing. Upon the trial court's denial of his motion, he entered a conditional guilty plea to transporting marijuana into the Commonwealth with the intent to distribute.

This appeal followed.

<u>Analysis</u>

I.

Appellant contends the stop was not supported by a reasonable, articulable suspicion of criminal wrongdoing because he had committed no traffic infraction and because "it was pure

speculation as to what the officers believed [he] was doing during . . . [their] surveillance."

Appellant argues the police did not arrest him during the surveillance period because they lacked

probable cause and the "requisite evidence to detain and arrest."

Fourth Amendment jurisprudence recognizes three categories of citizen-police

encounters. Sykes v. Commonwealth, 37 Va. App. 262, 267, 556 S.E.2d 794, 796 (2001).

> First, there are consensual encounters which do not implicate the
> Fourth Amendment. Next, there are brief investigatory stops,
> commonly referred to as "Terry" stops, which must be based upon
> reasonable, articulable suspicion that criminal activity is or may be
> afoot. Finally, there are "highly intrusive, full scale arrests" or
> searches which must be based upon probable cause to believe that
> a crime has been committed by the suspect.

McGee, 25 Va. App. at 198, 487 S.E.2d at 261 (citations omitted).

Reasonable suspicion is "'a particularized and objective basis' for suspecting the person

stopped of criminal activity." Ornelas, 517 U.S. at 696 (quoting United States v. Cortez, 449

U.S. 411, 417-18 (1981)). However,

> "[t]here is no 'litmus test' for reasonable suspicion. Each instance
> of police conduct must be judged for reasonableness in light of the
> particular circumstances." "In order to determine what cause is
> sufficient to authorize police to stop a person, cognizance must be
> taken of the 'totality of the circumstances—the whole picture.'"

Harmon v. Commonwealth, 15 Va. App. 440, 445, 425 S.E.2d 77, 79 (1992) (citations omitted).

> "The possibility of an innocent explanation does not deprive the
> officer of the capacity to entertain a reasonable suspicion of
> criminal conduct. Indeed the principal function of his investigation
> is to resolve that very ambiguity and establish whether the activity
> is in fact legal or illegal--to 'enable the police to quickly determine
> whether they should allow the suspect to go about his business or
> hold him to answer charges.'" 4 Wayne R. LaFave, Search and
> Seizure § 9.5(b), at 482 (4th ed. 2004) (citations and footnote
> omitted).

Raab v. Commonwealth, 50 Va. App. 577, 581-82, 652 S.E.2d 144, 147 (2007) (*en banc*). The

proper inquiry is "whether a police officer had a particularized and objective basis for suspecting

that a person stopped may be involved in criminal activity." Bass v. Commonwealth, 259 Va. 470, 475, 525 S.E.2d 921, 924 (2000). "Actual proof that criminal activity is afoot is not necessary[.]" Harmon v. Commonwealth, 15 Va. App. 440, 444, 425 S.E.2d 77, 79 (1992) (emphasis omitted).

Here, at the time Partin ordered the stop of appellant's car, he had received information that appellant had been selling a large amount of marijuana on a monthly basis for the last year and that he was receiving his supply from out of state. Based on his surveillance of appellant, Partin had observed appellant engage in a hand-to-hand transaction with Bynoe, a known drug dealer, and with another individual at a site associated with drug distribution. Both transactions involved the exchange of plastic baggies. Appellant also went to Bynoe's home on two occasions and dropped off full plastic baggies.

In addition, appellant visited Burton, a suspected drug dealer, and held a plastic bag filled with cash while standing outside an apartment smelling of marijuana. Kline testified that drug transactions "typically" involved the exchange of cash in a plastic bag for drugs in a plastic bag.

Finally, during the same time period as appellant's suspected transactions with known and suspected drug dealers, appellant visited the airport on three occasions and retrieved suitcases, even though he was not traveling. On at least one occasion, appellant picked up the suitcase without an accompanying passenger. On the other two occasions, appellant retained the suitcases after dropping off the passenger at a motel.

Partin testified that, based on these circumstances, he concluded appellant was involved in drug distribution. Despite this testimony, appellant maintains his stop was instead based upon speculation, and cites the following testimony from Partin:

> Q: I'm going to fast forward this to June 4, because on the other dates when you observed [appellant] give items to people or take

- 8 -

bags, you can't say with – you can't say what was in each bag; is that correct?

A. No more than speculation.

Later, when Partin was asked if he ordered the stop of appellant's vehicle because he "speculated that there was marijuana in those bags," Partin responded affirmatively.

While Partin may not have *known* what was in the bags on the day of the stop, Fourth Amendment jurisprudence did not impose such a heavy burden on the officer to justify the stop. For Fourth Amendment purposes, Partin needed only a reasonable, objective basis for suspecting appellant possessed marijuana; absolute certainty was not required. See Harmon, 15 Va. App. at 444, 425 S.E.2d at 79. We have held, for example, that hand-to-hand exchanges *reasonably believed* to be drug transactions may form the basis of a reasonable suspicion; police are not required to observe the *actual* drugs exchanged between a defendant and a third party. See Lawson v. Commonwealth, 55 Va. App. 549, 552, 687 S.E.2d 94, 95 (2010) (defendant observed engaging in what officer "believed were 'hand-to-hand' drug transactions from his vehicle"); Depriest v. Commonwealth, 4 Va. App. 577, 585, 359 S.E.2d 540, 544 (1987) (where officer did not observe suspected narcotics change hands during hand-to-hand transactions, circumstances did not establish probable cause, but did supply reasonable suspicion). See also Kidd v. Commonwealth, 38 Va. App. 433, 444-45, 565 S.E.2d 337, 342 (2002) ("[T]he fact that [the officer] did not see and could not identify the items that were exchanged in the hand-to-hand transactions . . . does not preclude a finding of reasonable suspicion under these circumstances.").

Here, based on totality of the circumstances, Partin had a "particularized and objective basis," Ornelas, 517 U.S. at 696, for suspecting that appellant was engaged in drug distribution and that the drugs were arriving from out of state through suitcases shipped on commercial airliners. Based on appellant's activities over the previous forty-six days, Partin was justified in

stopping and briefly detaining him after he retained suitcases with which he had not traveled and which he had recently retrieved from the airport.

Accordingly, we conclude the trial court did not err in denying the motion to suppress.[7]

## II.

Likewise, we find no merit in appellant's argument that the trial court erred by reconsidering its decision regarding the admissibility of the confidential informant's statements to Partin and its associated ruling on the suppression motion.

"Motions to reopen an evidentiary record or to reconsider a prior ruling involve matters wholly in the discretion of the trial court." Thomas v. Commonwealth, 62 Va. App. 104, 109, 742 S.E.2d 403, 406 (2013) (citations omitted).

> A litigant's "right to relief on such rehearing depends upon his ability to point out some error on the face of the record, or to show some legal excuse for his failure to present his full defense at or before the time of entry of the decree which he seeks to have modified."

Id. (quoting Downing v. Huston, Darbee Co., 149 Va. 1, 9, 141 S.E. 134, 136-37 (1927)). Here, through its motion to reconsider, the Commonwealth revealed an error in the trial court's original evidentiary ruling.[8] Furthermore, as the trial court had not yet entered an order granting appellant's suppression motion, the Commonwealth was not required to demonstrate a "legal excuse" for its failure to present its argument and proffer on the hearsay issue at the initial suppression hearing. See McBride v. Commonwealth, 24 Va. App. 30, 35, 480 S.E.2d 126, 128

---

[7] Based on our decision, we need not reach the Commonwealth's alternative argument that the stop was justified by the presence of an air freshener dangling from appellant's rearview mirror.

[8] Although the trial court had initially sustained appellant's hearsay objection to Partin's testimony regarding the details of the confidential informant's tip, "[i]t is well established . . . that hearsay testimony is admissible at a suppression hearing." United States v. Collins, 577 Fed. Appx. 180, 186 (4th Cir. 2014) (citing United States v. Matlock, 415 U.S. 164, 172-75 (1974); United States v, Raddatz, 447 U.S. 667, 679 (1980)) (parentheticals omitted).

(1997) ("A court speaks through its orders and those orders are presumed to accurately reflect what transpired.").

Thus, the trial court did not abuse its discretion by entertaining and granting the Commonwealth's motion to reconsider its original evidentiary ruling. Upon allowing Partin to testify regarding the information the confidential informant related to Partin, i.e., that appellant had regularly sold the confidential informant large quantities of marijuana imported from out of state, the trial court did not err in reconsidering its bench ruling and in denying the motion to suppress.

<u>Affirmed.</u>